In re KDT INDUSTRIES, INC. f/k/a King's Department Stores, Inc., d/b/a King's, Barker's, Kens, Coronet Cosmetics, Barkleigh, Mammoth Mart, et al., Debtors.

IRVING BYELAS IRREVOCABLE TRUST, Plaintiff,

v.

KDT INDUSTRIES, INC. f/k/a King's Department Stores, Inc. d/b/a King's, Barker's, Kens, Coronet Cosmetics, Barkleigh, Mammoth Mart, et al., Debtors/Defendants.

Bankruptcy Nos. 82 B 11453–82 B 11515 and 82 B 11687–82 B 11718 (PBA). Adv. No. 82–6500–A.

United States Bankruptcy Court, S.D. New York.

Sept. 7, 1983.

Grutman, Miller, Greenspoon & Hendler, New York City, for Irving Byelas Irrevocable Trust, plaintiff; Stanley B. Hendler, Donna Sue Moore, New York City, of counsel.

Goulston & Storrs, Boston, Mass., Levin Weintraub & Crames, New York City, for KDT Industries, Inc., et al., debtors/defendants; James F. O'Brien, Boston, Mass., Richard S. Miller, New York City, of counsel.

DECISION DENYING REQUEST FOR MODIFICATION OF AUTOMATIC STAY AND FOR CERTAIN OTHER RELIEF

PRUDENCE B. ABRAM, Bankruptcy Judge.

This adversary proceeding was commenced by Irving Byelas Irrevocable Trust (the "Landlord") on December 7, 1982 seeking, *inter alia,* possession of, and termination of the lease for, the premises known as Store No. 403, located at Boston Post Road and Buckley Road, Westport, Connecticut in a strip-type shopping center, which includes a Stop & Shop supermarket and a Peoples

Savings Bank, as well as other stores and office space. The facts are as follows:

## FINDINGS OF FACT

On February 3, 1961, the Landlord's predecessor leased to Franklin Stores Corporation, as tenant, the Store No. 403 premises for a 15-year term ending on November 30, 1976 for the conduct of a department store. The tenant was also granted three (3) five-year renewal options. Presently, the lease will expire on November 30, 1986 subject to the right to exercise the final renewal option. The tenant under the lease is now Cornwall King's Equities, Ltd., one of the debtors, who received an assignment of the tenant's interest in August 1980.

The lease requires payment of a base rental of $88,121 annually, payable in monthly installments of $7,343 each. In addition, percentage rent is payable on annual gross receipts in excess of $5,036,-243.94. The lease provides that the tenant must keep separate and accurate records of gross receipts which the landlord may audit (Article III); the tenant cannot place any signs or fixtures on the exterior of the premises without permission from the landlord (Article XI); and the tenant has 30 days to cure or commence to cure any default (except 10 days if the default is failure to pay rent) after receiving notice of default from the Landlord (Article XX, Section 1).

No percentage rent was paid until 1976. In 1980 the percentage rent declined from that of the previous year and on January 18, 1981, the landlord advised the tenant that it had elected to inspect and audit the sales records. The landlord retained R.G. Foster & Associates, Inc., the largest company in the United States and Canada specializing in this type of examination, to conduct the examination. Mr. George Desharnais, R.G. Foster's northeast regional manager, was assigned to the project and made the actual inspection and audit.

Mr. Desharnais' first step was to visit Store No. 403 to "shop the store." This visit was part of his routine audit procedure. The purpose of the visit was to make first hand observations relevant to the audit and inspection goal of determining whether gross sales were being accurately reported. Mr. Desharnais observed sales in order to determine whether cash registers were in operation, and he otherwise observed the operations and layout of the store. After shopping the store, Mr. Desharnais made an appointment and travelled to the offices of KDT Industries, Inc. ("KDT") in Bronx, New York to review the sales records for the store. His inspection at the Bronx office was brief because much of the information he requested to inspect was unavailable as it was in transit to KDT's Boston office.

On February 25, 1981 the Landlord sent a notice of default to the tenant. The notice stated that the audit "establishes that * * * [the tenant] has been systematically excluding receipts from merchandise sold, from the premises, from the gross receipts report which the percentage rent is based upon." The notice went on to state that it could also be established that employee discount sales had been included at the discount price instead of the retail price and that there was no such exclusion in the lease. No specific dollar amounts were mentioned. The letter stated "There are other items which were omitted which are not necessary to mention now." The tenant was given ten days to resolve the matter.

The Landlord also sent a second letter on February 25, 1981. This letter objected to the erection the previous day of a new sign which changed the store name on the facade from Barker's to King's on the basis that the sign had been erected without the Landlord's prior consent and that the new sign violated a separate letter agreement as to size, style and spread. The letter stated "You are to immediately remove the sign without any delay." The letters in the King's sign are noticeably larger than the letters in the Barker's sign it replaced. The letters may no be quite the same shade red as the other signs in the shopping center and appear to have white edges unlike the other tenant signs. Several years prior to this sign change the Landlord at its expense

renovated the shopping center by installing a facade on the various store fronts to unify and upgrade the center's appearance. At that time, the Landlord entered into separate agreements with each tenant with respect to the size, design and color of a new facade sign for each store and the Barker's sign had been installed then.

Upon receipt of the two February 25 letters, the tenant initiated a series of communications with the Landlord directed at determining what the nature of the percentage rent violation was and correcting the problem with the sign. The tenant concedes that the sign was erected without securing the prior approval of the Landlord.

When the rent default letter was sent, the Landlord had not yet received a copy of the R.G. Foster report and did not receive a copy until March 10, 1981. (As set forth below, the tenant did not receive a copy until May 26, 1981.) In light of its relevance to this dispute, the two operative pages of the R.G. Foster report are annexed as an appendix to this opinion. Based upon its examination, R.G. Foster determined that the tenant owed the Landlord an additional $216.20 as percentage rent, including interest, for the years 1978 to 1981 for unreported sales.

On February 27, 1981, following a telephone conversation between them on February 26, the Landlord wrote to the tenant agreeing to forebear from any immediate action on the two February 25 letters to give the tenant an opportunity to look into the matter. The final paragraph of the letter states as follows:

"I also want to point out now which was not spelled out in my letter concerning percentage rent, that my auditor determined that no figures for sales from vending machines had been included in the gross sales figures. At the time of the audit, he had surveyed the store and counted twenty-six various kinds of vending machines. I anticipate receiving his written report shortly."

On March 12, 1981, the Landlord sent a letter to the tenant listing only the findings itemized as 1 through 6 in the R.G. Foster report. The letter stated that the findings were considered to be a breach of the lease in two respects: (1) the failure to include items in gross receipts that the Landlord was entitled to for the purposes of calculation of percentage rent; and (2) the failure of the tenant to keep separate and accurate records of gross receipts. The Landlord's letter goes on to state that

"in view of the foregoing breaches, that it would be timely to renegotiate the rent factor in the lease in consideration of my waiving claimed breaches of the lease."

A rental increase to $23,800.00 per month, or an approximately three hundred percent increase, was suggested as appropriate.

On March 14, 1981, the tenant sent to the Landlord a letter enclosing specifications for a proposed new sign to replace the one previously erected. The new specifications provided for a substantial reduction in the size of the letters, from six feet to four feet.

By letter dated March 18, 1981, the Landlord wrote the tenant that no further action on the March 14 letter concerning the replacing of the sign need be taken by the tenant until the tenant had an opportunity to consider the March 12 letter. The tenant requested until April 6 to consider the proposal and the Landlord countered that a decision should be communicated no later than March 25.

On or about April 7, 1981 the Landlord issued to the tenant a notice to quit possession of the premises on or before April 20, 1981. The tenant did not quit possession, and on April 21, 1981 the Landlord commenced a summary process action in the Superior Court at Norwalk, Connecticut, against KDT, seeking a judgment of immediate possession of the premises.[1] The

1. In response to the notice to quit the tenant initiated a declaratory judgment action in the United States District Court seeking a determination as to whether there had been a breach of the lease. That action was voluntarily dismissed because of the necessity of joining a subsidiary, which, if joined would have destroyed the diversity of citizenship and thus

Landlord alleged that the lease for Store No. 403 had been terminated due to the following defaults: (1) failure to pay percentage rent as required; (2) failure to keep separate and accurate records of gross receipts; (3) installation of a sign without permission; (4) vacating or abandoning premises by the tenant; and (5) apparent attempted assignment of the lease and supplemental agreement without Landlord permission.

During the course of discovery in the state court action the tenant finally received a copy of the R.G. Foster report and for the first time learned the dollar amount of the claimed under-reporting. Upon receiving the report, KDT promptly sent a check for $216.20 to the landlord on May 26, 1981. Pursuant to the last paragraph of the letter accompanying the check, the payment was not to be construed as an admission of default or that the payment was indeed due the Landlord and it was tendered without prejudice to the tenant.

On June 29, 1981 the summary process action was tried, and the parties subsequently filed briefs. At some point, KDT made a motion for reargument. No decision has ever been rendered in that action and the matter was *sub judice* when these cases were filed and the automatic stay provided by Bankruptcy Code § 362, 11 U.S.C. § 362, intervened.

On December 7, 1982, the Landlord instituted this adversary proceeding. The complaint contains five counts: Count one seeks to lift the automatic stay on the grounds the Landlord's interest is not adequately protected and on the basis of the state court action; count two deals with the installation of a sprinkler system; count three seeks a declaration that the tenant is wrongfully occupying the premises without any rightful claim to possession; count four seeks a declaration that the Landlord is not stayed from enforcing its rights pursuant to the purported termination of lease by reason of default and from recovering possession in this or another court; and count five seeks to have the court fix a date by which

deprived the District Court of jurisdiction.

the debtor must assume or reject the lease. Count two is not in issue at this time as the parties have stipulated to reserve the issue to a future time. Count five was not addressed at trial and the court will leave for a future date the question of whether the debtor must assume or reject the lease prior to confirmation. Thus, this opinion will deal only with the issues raised by counts one, three and four.

At the trial on this adversary proceeding Mr. Desharnais testified on behalf of the Landlord. His testimony was that he prepared the R.G. Foster report referred to above and that it was the practice of R.G. Foster to report only verifiable facts, not to make estimates or guesses. It is apparent from his report that, while he reported underreporting of percentage rents by a total of $216.20, the figure for the categories he considered underreported must have been somewhat higher as no records were available to him to review for vending machine sales for 1980, employee discounts for 1978 or 1979 and for certain other periods for these items. Mr. Desharnais refused to speculate on what the records he did not review might reflect as additional percentage rental due. There is no suggestion that any higher figure would not also be nominal.

Mr. Desharnais testified unequivocally that the reference in items 1 and 2 of the R.G. Foster report to inadequate internal controls related only to the vending machine sales, employee and senior citizen discounts and telephone receipts. He stated that "I couldn't make a definition on the other [i.e. general sales figures] because I wasn't provided with the tapes and with the daily reports." Transcript at 52–53. It is apparent from items 7 through 12 of the report that Mr. Desharnais did not consider any further review of the tenant's records with regard to general sales or otherwise to be required, even though he had not seen all of the requested records. The report states that it is concluded that sales were in fact being registered and cash registers used

(Transcript of February 1, 1983 pp. 22–23).

(Item 7); that merchandise displays had been made attractive to customers (Item 8); and that the displays of merchandise were quantitatively sufficient (Item 9). The report recommends that the Landlord have a conference with the tenant to discuss R.G. Foster's findings (Item 11) and that a reexamination be had at the tenant's expense in six months (Item 12).

The cash registers in Store No. 403 are a sophisticated type that generates information enabling production of computerized sales reports. Mr. Desharnais is thoroughly familiar with computer register systems and did review the master computer listing for Store No. 403 against the sales reported to the Landlord and found they tallied exactly. Leslie Byelas, who testified on behalf of the Landlord asserted that there were unrecorded sales due to the use of cash registers outdoors to sell garden products. As Mr. Desharnais made no mention of any such problem and Hugh Rogovin on behalf of the tenant stated that all sales from outdoor registers were included in the sales totals, the court finds that the assertion of unrecorded sales unsubstantiated.

Mr. Rogovin further testified that KDT had recently acquired a number of leases, including the lease for Store No. 403, at the time of the alleged defaults and that, in the vast majority of cases, sales were not close to the number at which percentage rents became payable.' As a matter of convenience in preparing reports to landlords respecting sales, miscellaneous sales had been omitted since no percentage rent was payable in any event, but KDT had apparently overlooked treating this situation differently since percentage rent was payable.

### DISCUSSION AND CONCLUSIONS OF LAW

■ There is no dispute that a lease, such as the lease for Store No. 403, would constitute property of the estate under Bankruptcy Code § 541, 11 U.S.C. § 541. Nor is there any dispute that a tenant's unexpired lease for real property is an executory contract subject to assumption and assignment pursuant to the terms and conditions of Bankruptcy Code § 365, 11 U.S.C. § 365, although no motion to assume and assign the lease for Store No. 403 is presently before the court.

"If the termination of a lease has not been completed, or if it can be reversed by application of state procedures (so that the matter is still *sub judice*), the trustee or debtor in possession may still assume such rights and pursue them." *In re GSVC Restaurant Corp.,* 10 B.R. 300 (D.C. S.D.N.Y.1980).

There was no judicial determination prior to the filing date that the lease for Store No. 403 had been terminated. Both parties agree that Connecticut law applies and that it does provide for equitable relief from lease forfeiture. However, the Landlord urges that equity will never relieve a tenant from forfeiture of a lease when the breach is wilful and therefore the termination of this lease would be upheld. This court is satisfied that the Landlord's position is erroneous and that, under Connecticut law as embodied in the cases, equitable relief from forfeiture would be available in the facts of this case. Thus, the court need not reach the difficult question of whether Bankruptcy Code § 365(b), 11 U.S.C. § 365(b), superimposes a federal equitable standard on lease termination issues by providing that a lease may be assumed upon the compensation of a landlord for actual pecuniary loss resulting from a default.

Prior to considering the Connecticut decisions on equitable relief from a lease forfeiture, it is necessary to determine whether there had been a breach of the lease for Store No. 403. Obviously, if the court were to find that no breach had occurred, it would not be required to consider whether equity would intervene.

The Landlord, based on the R.G. Foster report, has asserted that the tenant breached the lease by virtue of its failure to pay percentage rent on all gross receipts. The tenant has argued that the Landlord failed to give an appropriate default notice with respect to the alleged percentage rent default. A question certainly exists whether the February 25 notice ever ripened into a

default. That notice stated that the tenant had 10 days to cure, or "satisfactorily resolve" the failure to keep separate and accurate records of gross sales on which percentage rents were due. The 10-day period was based apparently on the lease provision for a 10-day period for curing a default in the payment of rent. This court is of the view that in order to take advantage of the 10-day rent default provision the default notice must specify a dollar amount and the tenant must fail to tender the specified dollar amount in the 10-day period. The rationale for this result is amply illustrated in this case: as soon as the tenant was advised of the exact dollar amount alleged by the Landlord to be due it tendered the full amount.

For defaults other than rent, under the terms of the lease the tenant must neglect or fail to perform or observe the terms, provisions, conditions and covenants for thirty days after notice, or if more than thirty days is required by reason of the nature of the default, the tenant must proceed within the thirty-day period to commence and to proceed diligently to cure. Here the tenant promptly responded to the Landlord's default notice and attempted to ascertain the nature of the default. In its March 12 letter, the Landlord omitted reference to the second half of R.G. Foster's findings, which were crucial to understanding the findings which the Landlord did disclose, and the Landlord failed to state the dollar amount of the unreported percentage rents found by R.G. Foster. That letter states that in view of the breaches, the rent should be substantially renegotiated.

The totality of the circumstances surrounding the default notice respecting percentage rent payments, including subsequent communications, leaves the court of the view that a Connecticut court might find the notice ineffective. *See, e.g., Windsor Properties, Inc. v. Great Atlantic and Pacific Tea Company, Inc.,* 35 Conn.Sup. 297, 408 A.2d 936, 939 (1979) ("In view of the obvious inconsistency between those letters and the pending eviction proceedings, the court would be required to find a waiver of the lease forfeiture, if any such forfeiture occurred."); *Danpar Associates v. Falkha,* 37 Conn.Sup. 820, 438 A.2d 1209 (1981) (court reviewed at length the equivocal conduct of landlord after issuance of default notice). The courts construe notice requirements in a highly technical fashion because equity abhors a forfeiture.

Although the court in *Danpar Associates v. Falkha, supra,* discussed the possible defect in notice, it nevertheless went on to consider whether, assuming a default had occurred, equity would intervene. This court will follow that lead. However, before discussing that issue, it is necessary to consider whether the acts complained of were, in fact, a violation of the lease. The lease provides that percentage rent is to be paid on gross receipts, which are defined in Article III of the lease as follows:

"the sales price of all merchandise of every sort whatever sold, and the charges for all services performed for which charge is made by the Tenant or any other person, persons, firm or corporation selling merchandise or performing service of any sort in, upon, or from any part of the demised premises, and receipts from all business done or transacted in, upon or from said premises * * * but shall exclude * * * (b) allowances made by the tenant to its customers * * *."

The Landlord contends that vending machine and telephone receipts fall within the scope of the definition of gross receipts and further that the tenant is required under this definition to report employee and senior citizen discount sales at the regular sales price and not the discount price. The court agrees with the Landlord as to the first contention but disagrees as to the latter.

Vending machine and telephone receipts can be viewed as "all merchandise of every sort whatever sold ..." or as "the charges for all services performed for which charge is made"[2] or even "receipts from all busi-

2. A choice between these two phrases depends on facts not of record. If the tenant does not own the vending machines and/or does not fill the machines itself so that it merely receives a

ness done." While this article of the lease could have been drafted to refer specifically to these miscellaneous receipts, this court concludes that these items are part of gross sales on which percentage rent is due.

However, as to employee and senior citizen discount sales, the lease provides "[gross receipts] shall exclude ... (b) allowances made by the tenant to its customers." The amount of the discounts are an allowance. There is nothing to indicate that customers do not include employees or senior citizens nor is it logical to suppose otherwise. The same result may alternatively be reached by construction of the term sales price in the phrase "the sales price of all merchandise." Sales price is the price at which the tenant sells the goods. There is no question that the sales price of goods generally marked down is the marked down price. The goods sold to senior citizens and employees are sold at a different and lower sales price than those goods would be sold to others and can be viewed as a form of limited availability mark down sale. While the employee discounts might be viewed as a form of compensation to employees and thus an argument can be made that the tenant is "paying" the amount of the discount towards the sales price, the court rejects this line of reasoning as too remote. In any event, no such analysis is possible as to the senior citizen sales.

Thus, the Landlord is only partially correct as to the asserted default in the payment of percentage rent. An analysis of the R.G. Foster report reflects that $48.33 of the $216.20 relates to employee and senior citizen discounts and that the bulk of the unavailable records relates to this category. Thus, for simplicity in the balance of this opinion, the percentage rent default will be referred to as $216.20, although it is understood that the actual figure is both different and might be slightly higher. The claim that the tenant generally failed to keep accurate records of gross receipts from which percentage rents could be ascertained is not supported by the record, as discussed earlier. Moreover, the Landlord failed to utilize the procedures for a full audit of the tenant's books and records by an accountant provided by Article III of the lease. The Landlord's failure to request a further inspection opportunity warrants the inference, in light of the R.G. Foster recommendation, that it was not expected to reveal anything beyond that already noted.

The Landlord has also asserted as a breach of the lease the installation of the new sign on the grounds that it was erected without prior permission and that its size and design violated a supplemental letter agreement. As the supplemental letter agreement is not of record, the court is unable to evaluate the tenant's March 14 proposal against it. However, it appears to the court that that agreement was very particular and dealt with the specific "Barker's" sign. The new sign is the name "King's", which has fewer letters, and therefore the supplemental agreement apparently provides no exact solution to the question of what is a reasonable sign. Although, obviously, the tenant had the unilateral ability to remove the new sign, the Landlord waived his initial demand that the sign be removed. No new sign could be installed without the Landlord's prior approval, which could not be unreasonably withheld. Thus, as to a new sign, the burden of action was upon the Landlord once it was presented with a drawing for a new sign. Whether Leslie Byelas on behalf of the Landlord ever unequivocally rejected the March 14 proposal and whether that rejection would have been unreasonable are issues the court need not reach since it is prepared to find that equity would relieve any forfeiture based on the installation of the sign without prior permission.

commission, then the provision of vending machines can be viewed as a "service" for which a "charge" is made. On the other hand, if the tenant owns the machines and fills them itself, one can view sales from the machines as the sale of "merchandise" for which a "sales price" is paid in the form of the required coinage. This distinction can affect what portion of the "price" is reportable as part of gross receipts. *See Herbert's Laurel-Ventura, Inc. v. Laurel Ventura Holding Corp.,* 58 Cal.App.2d 684, 138 P.2d 43 (1943).

■ The allegation that a default in the lease occurred as a result of an assignment to the present tenant without the prior permission of the Landlord the court finds to be without merit. Article XXIII of the lease provides that tenant has the right to assign the lease or sublet the premises to any person, firm, or corporation, provided that tenant remains liable under the lease. Accordingly, the fact that the tenant came into possession of the premises without the prior consent of the landlord is irrelevant.

The final claim by the plaintiff is that at one point the tenant-debtor abandoned and vacated the premises in violation of the lease. On the date of trial the tenant-debtor was in possession of the premises. No proof was offered at trial on this issue.

The court is asked by the Landlord to hold that the breaches, including the $216.20 underpayment in percentage rent over a three-year period in which basic rental of over $265,000 was paid and the erection of an apparently nonconforming sign without prior approval, warrant a termination of the lease. The court declines this invitation. The breaches, which either have been cured or the tenant has offered to cure, are simply not of a magnitude to warrant forfeiture of a valuable lease. There has been no showing of bad faith by the tenant or any long-standing disregard for the provisions of the lease. Indeed, the tenant has at all times evinced its willingness to comply with the lease terms.

■ It is the law of the state of Connecticut that equity will intervene to avoid a forfeiture of a lease where circumstances so require.

"A court may enjoin a forfeiture of a lease based upon technical grounds 'to relieve a party against forfeitures and penalties not occasioned by his wilful neglect, upon the principle that one having a legal right shall not be permitted to avail himself of it for the purpose of injustice or oppression.' *Mackey v. Dobrucki,* 116 Conn. 666, 670, 166 A. 393, 395. Equity will intervene where 'the delay has been slight, the loss to the lessor small, and when not to grant relief would result in

such hardship to the tenant as to make it unconscionable to enforce literally' the conditions of the lease. *F.B. Fountain Co. v. Stein,* 97 Conn. 619, 626–27, 118 A. 47; *Galvin v. Simons,* 128 Conn. 616, 620, 25 A.2d 64."

*Nicoli v. Frouge Corp.,* 171 Conn. 245, 247, 368 A.2d 74, 76 (1976) petition for appeal denied, 174 Conn. 774, 379 A.2d 378 (1977) (On appeal, court upheld trial court's refusal to enjoin lease termination upon record showing numerous complaints over seven years about unsightly, unsavory and dangerous conditions created by the lessee's operations). *See also Danpar Assoc. v. Falkha,* 37 Conn.Super. 820, 438 A.2d 1209 (1981) (Relief from forfeiture granted upon finding that tenant at no time refused to pay increased rental although seeking a reduction in amount of increase and that tenant had paid rent as soon as it was unequivocally insisted upon); *Mayron's Bake Shops, Inc. v. Arrow Stores, Inc.,* 149 Conn. 149, 176 A.2d 574 (1961) (Landlord's refusal to accept rent after grace period but before notice of default excused tenant's nonpayment and barred landlord's right to claim a forfeiture of lease on grounds of nonpayment of rent).

The conduct of this tenant does not rise to the level of "wilful neglect." This was not simply the latest in a series of defaults by a tenant long indifferent to its legal obligations. Indeed, it seems to be rather the reverse, a case of a landlord looking to avail itself of minor defaults for the purpose of terminating a valuable lease to obtain a greatly increased rental.

The Landlord's reliance on *Zitomer v. Palmer,* 38 Conn.Super. 341, 446 A.2d 1084 (1982) is misplaced. In *Zitomer,* the defendants over a several year period evinced an unwillingness or inability to comply with the terms of a sale and leaseback arrangement for their home. The trial court concluded that the defendants were unable to meet the financial burden of owning or occupying the property and that equity did not require the plaintiff to forego repeatedly what were clearly his rights under the lease. In upholding the trial court's finding

that the equities more clearly lay with the plaintiff, the court held:

"There are no special elixirs which trigger the extraordinary remedies of equity. Each party seeking equitable relief in the summary process action is required to prove the necessity for invoking the powers of equity. The doctrine against forfeiture cannot be dilatorily invoked to eviscerate the statutory mandates of our summary process laws. Under circumstances, however, where the conscience is shocked or the forfeiture unconscionable, the doctrine against forfeiture should be an available shield to the tenant." 446 A.2d at 1087.

*Accord, F.B. Fountain Co. v. Stein,* 97 Conn. 619, 118 A. 47, 50 (1922) (Court reversed on grounds that lower court refused to permit introduction of evidence as to the equities. "The rule we adopt requires the admission of all evidence which tends to show the equity of the plaintiff's claim or the hardship of enforcing defendant's claim." The court refused to equate forgetfulness, which was at most mere negligence, with wilful gross or inexcusable neglect even though the tenant had falsely backdated a key notice).

The court's conscience would be shocked by a termination of this lease on the basis of a \$216.20 default in the payment of percentage rent and the erection of a sign without prior permission. The lease has been shown to be a valuable asset of the estate, and the breach was not wilful or brought about in bad faith. It would indeed be a gross miscarriage of justice to permit forfeiture of this lease in light of all of the facts and circumstances as set out in detail earlier in the opinion. Equitable relief will be afforded to the tenant.

## CONCLUSION

The automatic stay provided by Bankruptcy Code § 362 will not be lifted and the Landlord is stayed from terminating the lease for Store No. 403 on the grounds of the asserted defaults. The tenant is de-clared to be rightfully occupying the premises.

SETTLE ORDER.

## APPENDIX

March 5, 1981

### BARKER'S # 403

COMMENTS

1. We have reviewed the subject tenant's system of internal control as it relates to sales and are of the opinion that it *is inadequate.*

2. We found—

    A. An acceptable system of internal control embracing checks and balances is not present.

    B. No records maintained of employee and senior citizen discounts.

    C. Vending machine sales not recorded.

    D. No records for pay telephone.

3. We found that subject tenant was not reporting vending machine sales and reporting net sales after discount.

4. We have conducted examinations of primary sales data to the extent we considered necessary under the circumstances.

5. We worked closely with Ms. Ruth Low, Assistant Accounting Supervisor.

6. Subject tenant did concur with our accounting findings, as reported herein.

7. We have "shopped" subject tenant's store and have, through observation and the use of other means, concluded that sales were, in fact, being registered.

    Cash registers were utilized.

8. From observations, we formed the opinion that subject tenant's displays of merchandise have been made attractive to customers.

9. We formed the opinion that subject tenant's display of merchandise appears to be sufficient, quantitatively, leaving few blank spaces!

10. We formed the opinion while observing the demised premises that they

were in disarray due to re-organization of the store.

11. We suggest that landlord consider calling a conference with subject tenant to discuss our findings as reported that are of an accounting nature.

12. We further suggest that subject tenant be re-examined, at tenant's expense, in the next six (6) months due to his inadequate accounting system.

Respectfully submitted,
/s/R.G. Foster Associates, Inc.