Filed 6/17/15  Ralphs Grocery v. Midtown Shopping Center CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| RALPHS GROCERY COMPANY et al., <br><br> Plaintiffs, Cross-defendants, and Appellants, <br><br> v. <br><br> MIDTOWN SHOPPING CENTER ASSOCIATES, <br><br> Defendant, Cross-complainant, and Respondent. | B252292 [Consolidated with B254498] <br><br> (Los Angeles County <br> Super. Ct. Nos. BC493630 & <br> BC494962) |

APPEAL from a judgment of the Superior Court of Los Angeles County. William F. Fahey, Judge.  Reversed.

Horvitz & Levy, Barry R. Levy, Daniel J. Gonzalez; Crowell & Moring, Steven D. Allison, Van V. Nguyen, for Plaintiffs, Cross-defendants, and Appellants.

Levinson Arshonsky & Kurtz, Robert A. Levinson, Jason J. Jarvis, for Defendant, Cross-complainant, and Respondent.

\* \* \* \* \* \*

Ralphs Grocery Company (Ralphs) signed a long-term lease requiring it to share with its landlord a percentage of its "gross sales" if they exceed an agreed-upon threshold. The question presented in this appeal is whether, in calculating "gross sales" under the lease, Ralphs may use the amount that it actually charges its customers who receive discounts as part of Ralphs Rewards program, or whether Ralphs must instead use the higher price that these customers could have paid—but did not pay—if they had not been participating in the Rewards program. The trial court held it was the latter definition. We conclude it is the former, and reverse.

## FACTUAL AND PROCEDURAL HISTORY

**I.     The Lease**

In 1993, Ralphs and Midtown Shopping Center Associates (Midtown) signed a lease (Lease or Ralphs-Midtown lease) granting Ralphs the right to rent a 53,000 square foot space from Midtown in a west Los Angeles shopping center for at least 20 years, and up to 40 years. Under the Lease, Ralphs is obligated to pay (1) an annual base rental rate of $981,972, and (2) a "percentage rental" rate calculated as 1.25 percent of any "gross sales" over $31,200,000.[1]

The Lease defines "gross sales" as "the amount of the sales price, whether or not for cash or upon credit, of all merchandise, goods and the charges for services sold on or delivered from" the rented property. The Lease specifically "exclude[s] or deduct[s]" 15 matters from its definition of "gross sales." These exceptions include sales taxes, deposits on returned items, amounts refunded or credited to customers for defective items (as well as credits received from such items' manufacturers), sales from other stores, interest and credit charges imposed upon customers, sales from lottery tickets and coin-operated devices, sales of trade fixtures and equipment, bulk sales of inventory, and sales of crates and butcher scraps to other commercial users. Also "excluded or deducted" are "money-off coupons and vendor coupons" as well as

---

[1]     The lease also contemplates a third, "bonus percentage rental" payment also tied to "gross sales." We use "percentage rent" to refer to both "percentage rental" and "bonus percentage rental" under the Lease.

the net amount of any discount allowed to [Ralphs] employees when sales are made to such employees at prices below the retail selling prices then in effect . . . and *the net amount of any discounts* allowed to any charitable institution or organization, or *allowed to any customer pursuant to any customary and reasonable policy adopted by [Ralphs]*, including, but not limited to, the net cost to [Ralphs] of or resulting from the issuance to customers of trading stamps or other evidence of purchase for immediate or future exchange for merchandise or other things of value; merchandise or other things of value issued in redemption of such trading stamps or other evidence of value or as a premium or otherwise in connection with a sales promotion program[.]

Ralphs is also required to give Midtown a "detailed statement, certified by [its] financial officer . . . , showing the total Gross Sales" each year, and to allow Midtown to inspect its books.

## II. Ralphs rewards program

In 1997, Ralphs created a Rewards program to encourage (and reward) repeat customers. Under this program, Ralphs charges two prices for certain items of merchandise: (1) a higher price paid by customers who do not participate in the Rewards program; and (2) a lower price paid by customers who sign up for and participate in the program (Rewards customers). Which items are dual-priced varies from week to week. To drive home the savings for being a Rewards customer, the paper receipts generated at the check-out stand detail what Rewards customers would have been charged without the Rewards program discounts and calculates their resulting "savings." The program has been quite successful: Transactions by Rewards customers account for 97 percent of all transactions at Ralphs stores.

## III. Lease payments

Ralphs provided Midtown yearly statements reflecting what it believed constituted "gross sales" from the Midtown store, and calculated that total using the amount Rewards customers actually paid for merchandise rather than the amount they would have paid for the same items had they not participated in the Rewards program. Ralphs was not consistent in how it labeled its "gross sales" figure in its yearly statements; sometimes it used the term "Adjusted Sales," and other times it used "Net Register Sales." Ralphs also

3

made no special effort to verify that the figures it provided to Midtown met the definition of "gross sales" within the Lease.

## IV.    Litigation

When Midtown expressed its view that Ralphs was under-reporting "gross sales" under the Lease by not using what Rewards customers could have been charged, Ralphs filed a declaratory relief action against Midtown. Midtown cross-complained for breach of the Lease and the covenant of good faith and fair dealing, and also sued Ralphs for unlawful detainer. The actions were consolidated and tried in a two-day bench trial. The parties stipulated that Ralphs would owe Midtown nothing if "gross sales" were calculated based on the amount Rewards customers actually paid, but would owe Midtown $260,659 (not including interest or late charges) if "gross sales" were calculated based on the amount Rewards customers would have paid if they were not Rewards customers.

The trial court issued a written ruling in favor of Midtown. The court concluded that "gross sales" was based upon sales prices Rewards customers would have paid if they had not received Rewards program discounts, reasoning that "[t]he only ordinary and popular understanding of ["gross sales"] must start with the prices Ralphs' products are listed for sale for all of its customers before any discounts are applied, including the loyalty club discount." The court then found that the Rewards program did not fit within any of the Lease's exclusions or deductions from "gross sales": The Rewards program did not involve "money-off coupons," and did not qualify as a discount pursuant to a "customary and reasonable policy" because the Rewards program did not exist when the Lease was signed in 1993 and because no expert testified that such programs were "customary" in the supermarket industry. The court also ruled that Ralphs further breached the Lease by not providing Midtown with a "detailed statement[] of . . . deductions and exclusions."

The court imposed judgment, and awarded Midtown costs and attorney's fees totaling $305,000.

4

Ralphs timely appealed the judgment and fee award, and we consolidated these appeals.

## DISCUSSION

Because the parties have stipulated to the amount of damages, the primary question presented in this appeal is one of contractual interpretation: Does the term "gross sales" in the Ralphs-Midtown lease include the amount that Rewards customers actually paid for their merchandise, or the amount they would have paid had they not been Rewards customers? A secondary and related question is whether Ralphs yearly reporting statements complied with the Lease.

We are under a duty to interpret contracts independently. (*Hernandez v. Siegel* (2014) 230 Cal.App.4th 165, 170; Evid. Code, § 310, subd. (a) ["questions concerning the construction of . . . writings" are "questions of law"].) In so doing, we must "consider the contract as a whole and interpret the language in context, rather than interpret a provision in isolation," and must use the "ordinary and popular sense" of words "unless the words are used in a technical sense or a special meaning is given to them by usage." (*Dameron Hospital Assn. v. AAA Northern California, Nevada and Utah Ins. Exchange* (2014) 229 Cal.App.4th 549, 567, quoting Civ. Code, §§ 1641 & 1644.) Midtown argues that the trial court found the Lease to be ambiguous and made factual findings regarding extrinsic evidence that we must review for substantial evidence, but where we can interpret the Lease based solely upon its language without resorting to extrinsic evidence, our review remains de novo. (*Milazo v. Gulf Ins. Co.* (1990) 224 Cal.App.3d 1528, 1534; see also *Abers v. Rounsavell* (2010) 189 Cal.App.4th 348, 356 ["An agreement is not ambiguous merely because the parties (or judges) disagree about its meaning."].)

## I.     Meaning of "gross sales"

Because "the definition of the term 'gross sales' has no definitive judicial meaning" (*Papa Gino's of America, Inc. v. Broadmanor Assocs. Ltd.* (1985) 5 Conn.App. 532, 536-537 (*Papa Gino's*)) and because the parties offer two irreconcilable definitions of that term, we must decide and thereafter adopt the definition that would make the Lease "reasonable, fair and just" rather than "unusual and extraordinary." (*Sayble v.*

*Feinman* (1978) 76 Cal.App.3d 509, 513.)  The "reasonable, fair and just" definition of "gross sales" is the one that looks to the amount Ralphs actually charges its Rewards customers for merchandise, rather than the hypothetical amount Ralphs opts not to the charge them.  Three reasons support this conclusion.

First, this definition is more consistent with the terms of the Lease.  The Lease's definition of "gross sales" and its enumerated "exclusions and deductions," when read together, uniformly look to what money Ralphs actually collected and retained when selling merchandise to its retail customers.  At no point does the Lease base "gross sales" on what Ralphs could have charged, but elected not to charge, for merchandise.

Second, keying "gross sales" to the amounts actually received by Ralphs is more consistent with the purpose of generic and standardized percentage rental provisions like the one in the Lease.  Percentage rent provisions ordinarily serve two functions:  (1) they allow the landlord to share in the tenant's commercial success; and (2) they grant the tenant some economic peace of mind by linking any increase in rent to an increase in business revenue.  (*Western Medical Enterprises, Inc. v. Albers* (1985) 166 Cal.App.3d 383, 389-390.)  When "gross sales" relies on the amounts actually collected and retained by the tenant, the landlord is able to share in that increased revenue and the tenant is given its economic security.  But if "gross sales" is keyed to amount that could have been—but was not—charged, then the landlord's entitlement to rent is keyed to a hypothetical number not related to actual increases in revenue.  This outcome permits the landlord to get more rent even when the tenant is not enjoying greater revenues and simultaneously sacrifices the tenant's peace of mind because its exposure to higher rent is no longer contingent upon higher revenue.

Third, defining "gross sales" and "sales price" in the Ralphs-Midtown lease to mean the amount of money actually collected and retained by Ralphs is more consistent with the cases interpreting those terms.  In the context of percentage rent leases, the terms "gross sales" and "sales price" have consistently been interpreted to refer to the money the tenant "actually received."  (*Papa Gino's*, *supra*, 5 Conn.App. at pp. 536-537; cf. *In re KDT Indus., Inc.* (Bankr. S.D.N.Y. 1983) 32 B.R. 852, 858 [in percentage rent contract

6

tied to "sales price of all merchandise," "'[s]ales price is the price at which the tenant sells the goods"].)

The same is true in analogous situations. The Rewards program operates like a trade discount insofar as it is akin to a "device used by manufacturers to offer a reduced price to certain customers." (*E & H Wholesale, Inc. v. Glaser Bros.* (1984) 158 Cal.App.3d 728, 734 (*E & H Wholesale*).) As pertinent here, trade discounts are viewed as reducing the "sales price" and reducing "gross sales." (*Ibid.*; *United States v. California Portland Cement Co.* (9th Cir. 1969) 413 F.2d 161, 172 [trade discounts are "deemed a reduction in sale price"]; *Pittsburg Milk Co. v. Commissioner* (1956) 26 T.C. 707, 716 [trade discounts "reduce gross sales"] (*Pittsburgh Milk Co.*).) The Rewards program alternatively functions like a tax insofar as it is keyed to revenue. Tax law looks to what is actually collected and retained. (See, e.g., Rev. & Tax. Code, § 6011, subd. (a) [defining "sales price" as "the total amount for which tangible personal property is sold . . . valued in money"].) In interpreting federal tax law, *Affiliated Foods, Inc. v Commissioner* (2007) 128 T.C. 62, ruled that "gross sales" under federal tax law "must be based on the actual price or consideration for which the property was sold, and not on some greater price for which it possibly should have been, but was not, sold." (*Id.* at p. 82, quoting *Pittsburgh Milk Co.*, at p. 715.) This rule "has the obvious merit of reflecting economic reality" because "[t]he seller would make no sale at the list price; only at the net price can he attract the customer. The net price is the true consideration, regardless of the parties' bookkeeping hypocrisies." (*Max Sobel Wholesale Liquors v. C.I.R.* (9th Cir. 1980) 630 F.2d 670, 672.)

The trial court's ruling that the hypothetical "list" price was "[t]he only ordinary and popular understanding of" "gross sales" did not consider any of the arguments outlined above, and cited no legal authority or portion of the trial record for support. Its conclusion thus provides no basis for departing from the analysis we set forth above.

Midtown offers three further arguments in defense of its broader definition of "gross sales." First, Midtown asserts that the Lease's express command that the "net amount of any discount . . . allowed to any customer pursuant to any customary and

reasonable policy adopted" by Ralphs and that "money-off coupons and vendor coupons" be excepted from the definition of "gross sales" carries with it the strong implication that "gross sales" refers to the un-discounted and un-couponed list price. We disagree. These exceptions are certainly part of the 15 items "*excluded* or *deducted* from Gross Sales." But "deduction" connotes that an exception falls under the definition of "gross sales" (and must be deducted therefrom), while "exclusion" connotes it does not fall under the definition. The lease's equivocal language and its failure to specify whether the exceptions Midtown points to are to be "excepted" or "deducted" makes it impossible to infer a definition of "gross sales" from the "exclu[sions]" and "deduct[ions]" listed in the Lease. What remains certain, and as noted above, is that the Lease does not otherwise calculate "gross sales" on the basis of anything other than the actual money collected and retained by Ralphs for the retail sale of its merchandise.

What is more, even if the hypothetical list price not actually charged to or collected from Rewards customers were considered to be part of "gross sales," we conclude that the Rewards program confers a discount pursuant to a "customary and reasonable policy" adopted by Ralphs. Midtown urges that the Rewards program falls outside this exception because it was not created until four years after the Lease was signed. However, the Lease's enumeration of possible "customary and reasonably polic[ies]" was illustrative, rather than exhaustive, because that enumeration was "not limited to" the exceptions listed. More to the point, nothing in the Lease indicates the parties' intent to preclude Ralphs from developing new marketing strategies or to limit Ralphs—*for up to 40 years*—to those in existence in 1993. That 97 percent of all sales transactions are made by Rewards customers indicates that the program is "reasonable and customary" *at Ralphs*. Even if we accept the trial court's supposition that the program must be "reasonable and customary" across the entire industry, that definition is also met. We need look no further than the Civil Code, where our Legislature has found the use of such loyalty programs so pervasive that it saw fit to regulate them through the Supermarket Club Card Disclosure Act of 1999. (Civ. Code, § 1749.60 et seq.; accord, *Excentus Corp. v. Giant Eagle, Inc.* (N.D.Tex. July 2, 2012) 2012 U.S.Dist. LEXIS

8

91250, 2 ["These types of programs, increasingly common across the country, provide grocery store or other retail establishment customers with discounts at gasoline stations, gift cards, or other types of rewards."].)[2]

Second, Midtown argues that "gross sales" should be construed in its favor because Ralphs drafted the lease. Although "ambiguous language" in contracts is to be construed against the party that drafted it (*Securitas Security Servs., USA, Inc. v. Superior Court* (2015) 234 Cal.App.4th 1109, 1126), the term "gross sales" is not ambiguous in the context of this Lease and the weight of authority construing that term in similar contexts.

Lastly, Midtown points to Ralphs' careless and perhaps cavalier attitude in keeping financial records and in not correlating those financial records with the Lease's terms. The trial court drew an "adverse inference" against Ralphs on this basis. However, the questions before us are what the Lease means and whether Ralphs complied with it. Whether Ralphs was sloppy or even misleading in its record keeping sheds no light on these questions, and provides no grounds for construing the Lease in a different way.

For these reasons, we conclude that the term "gross sales" within the Ralphs-Midtown lease does not include amounts Ralphs never charged its Rewards customers, and, pursuant to the parties' stipulation, that Ralphs owes Midtown no additional rent.

## II.    Record keeping

We also determine that Ralphs did not breach the Lease, and that Midtown did not suffer any damages arising from any breach, in fulfilling its reporting requirements under the Lease. As noted above, the Lease requires Ralphs to "furnish" a "detailed statement . . . showing the total Gross Sales" each year—not, as the trial court found, a "detail[ed] statement of deductions and exclusions." Although its labeling was inconsistent, Ralphs provided Midtown figures that match the "gross sales" amount that

---

[2]     In light of our conclusion that this exception applies, we need not consider whether other exceptions might also apply.

Midtown stipulated would, if correct, result in an award of no damages, and we have concluded that this amount was the correct one. Ralphs did not have its "financial officer" certify all of its yearly statements, which the Lease also requires, but Midtown has not articulated how it was prejudiced by this, and we conclude it was not prejudiced in light of its stipulation that no additional rent would be owed if the gross sales figures were as Ralphs reported them. This claim consequently provides no basis for relief.

## DISPOSITION

The judgment is reversed and remanded with instructions to enter judgment for Ralphs and to vacate the award of costs and litigation expenses to Midtown. Midtown is to bear all costs on appeal.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.

HOFFSTADT

We concur:


_____, Acting P. J.

ASHMANN-GERST


_____, J.

CHAVEZ

10