Revised September 28, 1998

**UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

**No. 97-60504**
_____

**AFFILIATED FOODS, INC.,**

Petitioner-Appellant,

v.

**COMMISSIONER OF INTERNAL REVENUE,**

Respondent-Appellee,

_____

**Appeal from the decision of the United States Tax Court**
_____

September 25, 1998

Before POLITZ, Chief Judge, and JONES and DUHÈ, Circuit Judges.

EDITH H. JONES, Circuit Judge:

Affiliated Foods, Inc. ("Affiliated"), the organizational company for a non-exempt cooperative of small grocery stores, instituted the present action for a refund of alleged tax deficiencies for taxable years 1989 and 1990. Following a trial on the merits, the Tax Court found that Affiliated had earned income through its management of certain advertising funds destined for its shareholders. Affiliated has appealed. For the reasons stated below, this court affirms in part, reverses in part, and remands the case to the Tax Court.

## I.  FACTS

Affiliated operates a wholesale food purchasing cooperative for the purpose of supplying food and other consumer products to retail grocery stores owned by Affiliated shareholders ("Members").  By pooling their resources and using Affiliated as their purchasing agent for thousands of manufacturers and suppliers ("Vendors"), the Members achieve economies of scale otherwise unattainable by them through independent operation.

### A.  The Promotional Accounts

In order to increase the retail sales of Members, the Vendors encourage promotion of their products.  Often, Vendors reimburse Members directly for the costs of these promotions.  However, Vendors also maintain promotional accounts with Affiliated.[1]  When received, the promotional account funds are deposited in Affiliated's general operating account with Amarillo National Bank.  While the promotional account monies are commingled with funds used by Affiliated in day-to-day operations, meticulous records are maintained with respect to the promotional accounts.  Indeed, each Vendor receives a regular statement itemizing receipts and disbursements of its promotional account funds from Affiliated's account.

---

[1]Two of these promotional accounts were maintained through formal written contracts. Otherwise, the promotional accounts were retained, free of charge, based on oral agreements between Affiliated and the individual Vendor.

The manner in which the promotional account funds were disbursed was contested in the Tax Court. Adopting the Commissioner's theory of the case, the court found that Affiliated essentially provided advertising services to Vendors in exchange for the promotional account funds. In particular, the court focused on the size of Affiliated's advertising department and the amount of promotional account funds ultimately directed to that department. The court discredited the testimony of Affiliated's witnesses regarding when and why promotional account funds were released. The court did, however, recognize that release of the funds in the promotional accounts was contingent upon compliance with standards placed on Affiliated by Vendors -- either written or oral.

B.   *The Food Show*

Each year, Affiliated conducts a Food Show open only to Members. At these Food Shows, Vendor representatives promote Vendor products by setting up booths, offering product samples, and providing special discounts for products. In order to participate in this event, Affiliated requires that Vendors offer special cash discounts for Members. Many Members agree to purchase an entire year's requirement of a Vendor's products at the Food Show. For this reason, Vendor representatives must have an ample supply of available cash.

Vendors supply the funds for the cash rebates in several different ways. Vendors may directly supply the cash to representatives. More often than not, however, Vendors write checks to Affiliated or use the funds in their promotional accounts as a means of supplying Vendor representatives with the necessary rebate cash. The Vendors' checks are deposited in Affiliated's general operating account. When the Food Show begins, the Vendor funds are dispensed from Affiliated's general operating account to the Vendor representatives. At the conclusion of the Food Show, the Vendor representatives return the remaining funds to Affiliated. Affiliated returns these funds to Vendors or accounts for the funds in the respective Vendor's promotional account. As with the promotional accounts, Affiliated maintained meticulous records on the amount of funds received from Vendors and the amounts returned to each Vendor's promotional account.

The Tax Court found that the Food Show cash rebates were actually disguised patronage dividends. Distinguishing the cash rebates as payments made from Vendors to Members, the court determined that Affiliated retained substantial control over the funds before, during, and after the Food Show. The court construed the deposit of Vendor funds in Affiliated's general operating account as "earnings of the cooperative from business done with or for its patrons." The Tax Court noted that normally the income received from the Food Show rebates would have been deductible as

4

a "patronage dividend" when returned by Affiliated to the Members. However, because Affiliated was unable to meet the statutory requirements for a patronage dividend deduction,[2] the adjusted income was not deductible.

## II.  DISCUSSION

Affiliated is a non-exempt cooperative taxed pursuant to 26 U.S.C. §§ 1381-83.  At year-end, Affiliated may avoid taxation by distributing income to Members in the form of patronage dividends.  See 26 U.S.C. §§ 1382(b), 1388.  Once these patronage dividends are paid, Members must report the dividends as income. See 26 U.S.C. § 1385(a).  To the extent Affiliated retains income at year-end, the cooperative must report the amount as gross income.

The IRS adjusted Affiliated's 1989 and 1990 gross income to include the year-end balances of the promotional accounts and the total amount of cash distributed by Vendors to Members at the Food Shows.  The IRS construed all monies paid into the Affiliated promotional accounts as income.  However, Affiliated was allowed a deduction for the amount of funds expended on promotions.  Thus, only the year-end balances remained as taxable income.  With respect to the Food Show payments, all of the money which passed

---

[2]See 26 U.S.C. § 1388(a).

5

through Affiliated's general operating account to Members was included as gross income.

*A. Standard of Review*

The Tax Court's resolution of the disputed factual issues in this matter is subject to the clearly erroneous standard of review. See Fed. R. Civ. P. 52(a). Under the clearly erroneous standard, this court will reverse the decision of a lower court only if "left with the definite and firm conviction that a mistake has been made." Streber v. Commissioner, 138 F.3d 216, 219 (5th Cir. 1998). So long as there is evidence which supports a court's plausible account of the evidence, this court must affirm "even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Justiss Oil Co. v. Kerr-Mcgee Ref. Corp., 75 F.3d 1057, 1062 (5th Cir. 1996).

The imposition of tax by the Commissioner is presumptively correct; therefore, the petitioner must shoulder the burden of proving that the tax assessment was improper. See Welch v. Helvering, 290 U.S. 111, 115 (1933). Because the Tax Court's discussion of Affiliated's promotional accounts fundamentally misconstrues the operations of the cooperative, this court reverses the Commissioner's imposition of tax on the year-end balances of the promotional accounts. However, because Affiliated was unable to present records detailing the amount of Food Show rebates payable to individual Members, this court affirms the Tax Court's

6

decision regarding the adjustment to Affiliated's gross income for the Food Show rebates.

### B. *The Promotional Accounts*

#### 1. The Tax Treatment of Promotional Accounts

In a line of cases beginning with <u>Seven-Up Co. v. Commissioner</u>, the Tax Court set forth the standard controlling the present dispute. 14 T.C. 965 (1950). In <u>Seven-Up</u>, the manufacturer of 7-Up extract established a national advertising fund for the beverage produced from the extract. <u>See</u> <u>id.</u> at 968-69. 7-Up bottlers that participated in the national advertising program[3] made payments to the manufacturer based on the number of gallons of extract purchased. <u>See</u> <u>id.</u> at 974. The manufacturer placed these funds in one or more regular operating accounts -- commingling the advertising funds with operating funds. <u>See</u> <u>id.</u> Although no separate bank account was established for the funds, the manufacturer maintained the advertising funds separately on its books as accounts payable. <u>See</u> <u>id.</u> The advertising funds were viewed by the manufacturer as a whole -- no individual bottler

---

[3]The manufacturer made no specific commitment regarding the ultimate use of the funds other than the following:

> Expenditures for national advertising are a matter of public record, in advertising and business journals. Our books on advertising receipts and expenditures will be open to any bottler at any time.

<u>Seven-Up</u>, 14 T.C. at 978.

7

retained the right to the funds after payment.  See id.  The advertising agency in charge of the campaign billed the manufacturer; however, the parties involved understood that the advertising funds remitted from bottlers actually paid the advertising expenses.  See id. at 972.  If a balance remained in the advertising fund at year-end, the amount was carried over as an account payable for the next tax year.  See id. at 975.

On these facts, the Tax Court found that the advertising funds channeled through the manufacturer to the advertising agency did not constitute gross income.  See id. at 979.  The court noted,

> The payments made by the participating bottlers were not for services rendered or to be rendered by [the manufacturer].  Neither were they part of the purchase price of the extract.  They did not, therefore, constitute earnings received by the petitioner under a claim of right without restriction as to disposition, which petitioner would have had to include in its gross income. . . .

Id. at 977.  Finding the manufacturer merely constituted a conduit for the passing of funds from bottlers to the advertising agency, the court determined that the restrictions placed on the use of the advertising funds and the manner in which the manufacturer consistently treated the advertising funds precluded the imposition of additional tax on the manufacturer.  See id. at 977-79.

The Tax Court has confirmed the vitality of Seven-Up in other settings.  Two instances are of particular note.  In Ford Dealers Advertising Fund, Inc. v. Commissioner, the Tax Court

overturned the imposition of tax on the contributions of Ford and local dealers to a fund designed to increase advertising of Ford automobiles. See 55 T.C. 761, 772-74 (1971). Even though some fund resources were used to finance an incentive program for salesmen and a car-locator service, the court held that,

> [A]n intermediary may be employed as a depository for funds in trust which are destined for an ultimate use that is specified within defined limits. The benefit, profit, or gain is not to accrue to the intermediary but rather to some other entity.

Id. at 773. Even though the Advertising Fund held significant discretion regarding the ultimate disposition of the contributions, the parties involved intended that the Fund merely serve as an intermediary for the channeling of resources to a third-party -- without any resulting gain to the intermediary. Accordingly, the Tax Court refused to tax the year-end balance of the advertising fund as income.

In Florists' Transworld Delivery Ass'n v. Commissioner, the Tax Court further defined the relevant inquiry. 67 T.C. 333 (1976). A cooperative of florists -- similar to Affiliated -- received funds from member florists for the purposes of supporting a Clearing House Division and a Marketing Division. See id. at 335. The contributions to the Marketing Division funded national advertising for members. See id. However, the Marketing Division also performed services such as the printing and acquisition of promotional materials and office supplies for members, the

9

processing of customer billing, the compilation and distribution of market research, and the arrangement of customer gifts. See id. at 340. The Tax Court found that any benefit or gain received by the cooperative by virtue of the allocation of a portion of member contributions to the general administrative and operating expenses of the Marketing Division were merely "incidental and secondary." Id. at 346 (citing Angelus Funeral Home v. Commissioner, 47 T.C. 391, 395 (1967)). Thus, although the Marketing Division supplied members with services and used member advances for expenses other than national advertising, the Tax Court rejected the Commissioner's argument that member contributions should be included as gross income in the taxable year received. See Florists' Transworld, 67 T.C. at 347.

In its opinion, the Tax Court compared the Affiliated arrangement to Krim-Ko Corp. v. Commissioner, 16 T.C. 31 (1951). Krim-Ko manufactured chocolate syrup for use in the production of chocolate milk. See id. at 32. Krim-Ko and its customers engaged in an advertising program whereby customers paid Krim-Ko a certain amount per gallon of syrup, and, in return, Krim-Ko furnished "advertising features and sales promotion services." Id. at 33-34. Although the payments were commingled in Krim-Ko's general operating account, Krim-Ko maintained separate records for each customer's contribution to the advertising pool. See id. at 34-35. The Tax Court found that Krim-Ko was not acting as a mere

repository for the advertising funds. Instead, the court characterized the advertising arrangement as follows: "At most, Krim-Ko, as an adjunct to its principal business, had undertaken to sell special advertising material and services to its customers." Id. at 39. "[The advertising funds] were paid in consideration for Krim-Ko's promise to furnish designated advertising material and services." Id. at 40. Significantly, no restrictions were placed on the use of the funds, and Krim-Ko treated the funds as its property. See id.

### 2. The Proper Tax Treatment of the Affiliated Promotional Accounts

The Tax Court fundamentally misconstrued the operation of Affiliated's promotional accounts and, in so doing, improperly assessed tax on the year-end balances of the promotional accounts. As the Tax Court's determination rested on an examination of the facts and circumstances surrounding the promotional accounts,[4] this court carefully reviewed the Tax Court's findings. Based on the stipulations of the parties and the uncontroverted testimony of the witnesses, Affiliated merely served as an intermediary for its Members with respect to the funds placed in Vendor promotional accounts. Accordingly, Affiliated was not required to report these amounts as income during the 1989 and 1990 tax years.

---

[4]See Angelus Funeral Home, 47 T.C. at 395; Seven-Up, 14 T.C. at 977.

11

The Tax Court characterized the inner workings of the promotional accounts as follows: (1) a Vendor informs Affiliated of a promotional program; (2) Affiliated chooses which promotions to perform; (3) the Vendor then deposits an amount in the promotional account representing a cost plus allowance for performing the promotion; (4) upon proof of performance, the Vendor releases the funds from its promotional account as reimbursement and payment for Affiliated's advertising services. The court further found that the promotional account funds were rarely, if ever, refunded to participating Vendors. Specifically, the court seemed to focus on the revenue generated by Affiliated's advertising department. These findings, however, do not comport with the evidence and stipulations.

While Vendors informed Affiliated of the promotions and advertising that would trigger release of the promotional account funds, Affiliated neither controlled the ultimate decision to participate in the programs nor mandated the amount of funds a Vendor placed in the promotional accounts. Vendors deposited funds in the promotional accounts at their convenience and in increments of their choosing. Subsequently or as provided by contract, the Vendor would inform Affiliated of the promotion required to trigger the release of the funds. Affiliated would then place all of these promotional opportunities in a weekly "deal sheet." The deal sheet was forwarded to Members. Members then chose which promotions to

12

implement.  Once the Members performed these promotions, proof of performance was submitted, through Affiliated, to the responsible Vendor.  Upon receipt of proof of performance, the Vendor would authorize Affiliated to release funds from the promotional account as proposed in the advertising program.

The Tax Court's primary concern with the promotional account arrangement was Affiliated's advertising department. While Affiliated did maintain a large advertising department, no gain accrued *directly* to the advertising department based on Affiliated's receipt of promotional account funds.  After choosing to perform a promotion, Members were not required to use the department.  More often than not, however, Members did take advantage of the cost savings associated with using Affiliated's advertising department.  Though Affiliated generated revenue through the advertising department, this revenue was earned by providing services to Members -- not to Vendors.

Under Seven-Up and its progeny, Affiliated was not required to enter formal trusts with Vendors in order to avoid the accrual of income.[5]  As the Tax Court stated in Ford Dealers,

> [W]hen a taxpayer receives trust funds, which he is
> obligated to expend in entirety for a specified purpose
> and no profit, gain, or other benefit is to be received

---

[5]See Schochet v. Commissioner, 44 T.C.M. (CCH) 556, 565 (Tax Court 1982) ("Our use of terms such as 'trustee,' 'agent,' and 'conduit' serves for purposes of analogy, not as a requirement of a specific legal relationship.").

13

by him in so doing, the funds are not includable in gross income.

55 T.C. at 771. The fact that Affiliated commingled the funds in its general operating account and retained the funds at year-end, without refunding them to the Vendors, does not alter the appropriate tax treatment of the promotional accounts. See Seven-Up, 14 T.C. at 974. Similarly, reporting the interest earned on the promotional accounts as income does not affect the status of the funds under the tax laws. See Schochet, 44 T.C.M. (CCH) at 566 n.20; Florists' Transworld, 67 T.C. at 346 n.18.

Vendors retained control of all the funds placed in Affiliated's promotional accounts. See Schochet, 44 T.C.M. (CCH) at 564. No evidence, testimony, or stipulation controverts this fact.[6] Affiliated reported the promotional accounts on its corporate books as liabilities to Vendors and would not release the funds until ordered to do so by Vendors. Any discretion vested in Affiliated regarding the use of the funds does not destroy the most important operative facts in this dispute. Namely, Affiliated had no right to receive the promotional account funds, supplied no service to Vendors based on the receipt of the funds, and was

---

[6]Although the Tax Court discounted the testimony of several witnesses as vague and imprecise, no testimony or documentary evidence contradicts the essentially consistent testimony of these witnesses. Thus, while the court afforded this testimony little weight, no evidence was presented by either party to rebut the testimony.

14

sufficiently constrained in the disposition of the funds. See Ford Dealers, 55 T.C. at 771-73. Under these circumstances, the Tax Court clearly erred by including the promotional account funds in Affiliated's gross income for the 1989 and 1990 tax years.

*C. The Food Show*

Based on this court's review of the record, the Tax Court properly found that the Food Show cash rebates were actually disguised patronage dividends.[7] Vendors participated in the yearly Food Show by permission of Affiliated. In order to participate, a Vendor was required to offer special discounts to Members. Instead of passing on these discounts through the cooperative, Affiliated required Vendors to offer these discounts directly to Members at the Food Show. By structuring the transaction in this manner, Affiliated sought to avoid the proper method of accounting for patronage dividends.

Tax is assessed according to the economic substance of a transaction -- form is not controlling. See Griffiths v.

---

[7]In Buckeye Countrymark, Inc. v. Commissioner, the Tax Court defined a patronage dividend as follows:

> In general, a patronage dividend is an amount that is allocated or paid to a patron out of the net earnings of the cooperative from business done with or for patrons and that is based upon the quantity or value of business done with or for the patron, under a preexisting obligation to pay such amount.

103 T.C. 547, 555 (1994) (citing 26 U.S.C. § 1388(a)).

15

Helvering, 308 U.S. 355, 356-57 (1939). In this manner, a taxpayer is unable to subvert the tax laws based merely upon the structure of a transaction. See Mississippi Valley Portland Cement Co. v. United States, 408 F.2d 827, 833 (5th Cir. 1969). By negotiating for Food Show rebates, Affiliated provided for the direct payment of monies from Vendors to Members that would otherwise have accrued to Affiliated as earnings, i.e., rebates from Vendors to Affiliated for product purchased for sale by Affiliated. Moreover, a Member received Food Show rebates based on the amount of product purchased at the show. Thus, greater product purchases meant more Food Show rebates. The product, however, was not purchased directly from the Vendors at that time. Members committed to make purchases at the Food Show and subsequently bought the product through Affiliated. In this manner, a Member received rebates based on the amount of product purchased through Affiliated, and Affiliated was able to provide a patronage dividend without complying with the statutory requirements. See 26 U.S.C. § 1388; see generally Buckeye Countrymark, 103 T.C. at 558 ("Patronage dividends are considered

16

rebates on purchases. . . .").[8]  As such, this court affirms the decision of the Tax Court with respect to the Food Show rebates.

## III. CONCLUSION

The court finds no clear error with respect to the Tax Court's rulings on the Food Show rebates and, therefore, <u>AFFIRMS</u> the court's decision for the reasons stated.

The Tax Court impermissibly erred by characterizing the funds deposited in Affiliated's promotional accounts as payment for services it performed for the Vendors.  Affiliated merely served as a clearinghouse -- receiving information and funds from Vendors and passing on the information and funds to Members.  Any gain that accrued to Affiliated as a direct result of its role as intermediary was incidental.  On this issue, this court <u>REVERSES</u>

---

[8]As the 1989 and 1990 Food Show rebates will now have been taxed, potentially, to both Affiliated and its Members, this holding effectively imposes a dual tax on the cooperative's patronage dividends.  Normally, with proper supporting documentation, a patronage dividend would be reported as income and then deducted by Affiliated.  In the case of the Food Show rebates involving Western Family Foods, Affiliated was able to substantiate, through bookkeeping entries, the extent of the rebates, and the Tax Court allowed Affiliated an appropriate deduction for business expenses.  With respect to the other rebates, however, because Affiliated destroyed the only documentation, the cooperative was unable to meet its burden of proof regarding the patronage dividend deduction.  The Tax Court also found that Affiliated had conceded that the rebates were not deductible as business expenses and, moreover, that Affiliated had failed to support such a deduction with appropriate evidence at trial.  As such, Affiliated cannot support a deduction for the amounts that, based on the Tax Court's holding, must be included in gross income.

the decision of the Tax Court.  We <u>REMAND</u> to the Tax Court for recalculation of the Commissioner's deficiency assessments on income realized by Affiliated in 1989 and 1990 and such further proceedings as are appropriate and consistent herewith.

**AFFIRMED** in part, **REVERSED** in part, and **REMANDED.**