In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 24-3239

HYATT HOTELS CORPORATION & SUBSIDIARIES,

*Petitioner-Appellant,*

*v.*

COMMISSIONER OF INTERNAL REVENUE,

*Respondent-Appellee.*

———————————

Appeal from the United States Tax Court.
No. 13858-17 — **Joseph W. Nega**, *Judge.*

———————————

ARGUED SEPTEMBER 16, 2025 — DECIDED APRIL 22, 2026

———————————

Before KIRSCH, JACKSON-AKIWUMI, and MALDONADO, *Circuit Judges.*

KIRSCH, *Circuit Judge*. Hyatt Hotels operated a loyalty program that allowed members to earn points by spending money at Hyatt-branded hotels. The program's expenses were paid out of a centralized fund, which Hyatt managed and to which all Hyatt-branded hotels—including those owned by third parties in management or franchise agreements with Hyatt—were required to contribute. The fund also derived some income from investing in securities and selling

rewards points directly to customers. The Internal Revenue Service contends that Hyatt should have reported income to the fund as income to Hyatt; the tax court agreed. On appeal, Hyatt renews its argument that these payments into the fund weren't its income. If they were income, Hyatt claims that it should be able to use the trading stamp method of tax accounting, which would offset that income by associated costs. Because we find that the tax court's analysis was incomplete when it considered whether these payments into the fund were Hyatt's income, we refrain from deciding either of the issues raised by Hyatt. Instead, we vacate the tax court's decision and remand the case for further proceedings consistent with this opinion.

I

A

Hyatt Hotels Corporation & Subsidiaries is an international hospitality company that owns, manages, and franchises hundreds of hotels. Some of these hotels are owned by Hyatt, but other Hyatt-branded hotels are owned by third parties in management or franchise agreements with Hyatt. From 2009 through 2011, the tax years at issue, Hyatt owned about 20 to 25% of the hotels that bore its name.

Like other hotel chains, Hyatt operated a loyalty program during the tax years at issue, called the Gold Passport Program (Program). The Program allowed members to earn rewards points by spending money at Hyatt-branded hotels, which could later be redeemed for hotel stays and perks or travel miles. All Hyatt-branded hotels, including those owned by third parties, were required to participate in the Program.

To cover Program expenses, Hyatt managed the Gold Passport Fund (Fund), to which all Hyatt-branded hotels (those owned by Hyatt and otherwise) contributed. During the tax years at issue, hotel owners were required to pay 4% of qualifying purchases (i.e., purchases that earned Gold Passport points) into the Fund at the time the points were issued. Alternatively, if a Program member opted to earn travel miles instead of Gold Passport points, hotel owners paid into the Fund the actual cost of the miles. The Fund also derived some income from investing Fund assets in securities and directly selling Gold Passport points to customers. When a member redeemed points at a hotel, which might be long after the points were earned, Hyatt compensated the hotel owner for the stay out of the Fund. The Fund also covered administrative and advertising expenses.

According to Hyatt, the Program was a critical part of the company's broader marketing strategy and contributed to increased stays by Program members. During the years at issue, Hyatt's internal analysis shows that each dollar spent on Program advertising generated a return on investment of about $8 for Hyatt-branded hotels.

B

Since the Program's inception in 1987, Hyatt essentially ignored the Fund for tax purposes. In March 2017, the Commissioner of Internal Revenue issued Hyatt a notice of deficiency. The IRS asserted that Hyatt should have reported all income flowing into the Fund as its income. Some of that money (i.e., payments into the Fund by Hyatt-owned hotels) is not at issue here because it's already accounted for in Hyatt's income; Hyatt states that its owned hotels didn't deduct those payments as expenses and that they included all guest revenue in

income. But the IRS took the position that payments into the Fund from third-party hotel owners, direct point sales, and the Fund's investment holdings were Hyatt's income for tax purposes. According to the IRS, Hyatt could then deduct the cost associated with redeemed rewards points in the year of redemption, which might be long after—if ever—the points were earned.

Hyatt petitioned the tax court for a redetermination of the deficiencies in the IRS's notice. It made two arguments. First, Hyatt contended that the disputed payments into the Fund (i.e., payments from third-party-owned hotels, direct point sales, and the Fund's investments) weren't its income—in short, that Fund income wasn't Hyatt's income. Asserting that the Fund was collectively owned by the hotel owners and could only be used for Program purposes, Hyatt believed that Fund income was properly excluded from its income under the claim of right doctrine. That doctrine, "deeply rooted in the federal tax system," defines income as "earnings [received] under a claim of right and without restriction as to its disposition." *Healy v. Comm'r*, 345 U.S. 278, 281 (1953) (citation modified). Hyatt also maintained that exclusion was appropriate under the trust fund doctrine, which excludes from income trust funds that the taxpayer must spend "for a specified purpose," receiving, at most, an "incidental and secondary" benefit in return. *Affiliated Foods, Inc. v. Comm'r*, 154 F.3d 527, 531, 533 (5th Cir. 1998) (citation modified).

Second, Hyatt argued that if the Fund was Hyatt's property and Fund income was its income, then it was entitled to use the trading stamp method authorized by Treasury Regulation § 1.451–4. See 26 C.F.R. § 1.451–4(a)(1). Section 1.451–4(a)(1) applies to accrual method taxpayers that "issue[]

trading stamps or premium coupons with sales," which "are redeemable by such taxpayer in merchandise, cash, or other property." Loyalty programs are the modern analog of the physical trading stamps that retailers once issued as promotions with sales of their products. If applicable, the trading stamp method would permit Hyatt to deduct the estimated cost (to it) of members redeeming their Gold Passport points when those points were initially issued. Hyatt argued that the perks for which Gold Passport points could be redeemed—e.g., hotel stays and airline miles—were "other property" within the meaning of § 1.451–4(a)(1), and thus that it was eligible to use the trading stamp method.

The tax court ruled against Hyatt on both issues. It disregarded Hyatt's claim of right argument, finding that the doctrine didn't provide a basis for excluding income under the circumstances. Instead, the court applied the trust fund doctrine, assuming, without deciding, that the Fund was received in trust subject to a legally enforceable restriction. It therefore addressed only the benefit prong of the doctrine. Because Hyatt profited from Program advertising through increased hotel stays and brand goodwill, the court determined that Hyatt "had a sufficient beneficial economic interest in the Fund" for Fund income to constitute Hyatt's income.

The tax court then held that Hyatt wasn't eligible to use the trading stamp method. Applying the canon of ejusdem generis, the court reasoned that § 1.451–4(a)(1)'s "other property" catch-all term was limited to tangible property. Since hotel stays and airlines miles aren't tangible, the court concluded that Hyatt was not permitted to use the trading stamp method.

II

We review the tax court's legal conclusions de novo. *Feldman v. Comm'r*, 779 F.3d 448, 453–54 (7th Cir. 2015). On appeal, Hyatt disputes that income to the Fund was Hyatt's income and that Hyatt may not use the trading stamp method. Regarding the income determination, Hyatt argues that the tax court should have considered whether exclusion from income was appropriate under the claim of right doctrine. We agree. The claim of right doctrine provides a basis for income exclusion that is independent from and broader than the trust fund doctrine. The tax court therefore erred when it concluded that Fund income was Hyatt's income based on the trust fund doctrine, without considering Hyatt's argument for exclusion based on the claim of right doctrine.

Because we remand for the tax court to consider whether Fund income constituted income to Hyatt under the claim of right doctrine, we need not decide whether Hyatt is eligible to use the trading stamp method. We only clarify an interpretive issue that must be addressed, should that question arise again.

A

We start by reviewing the tax court's refusal to apply the claim of right doctrine. The court disregarded Hyatt's claim of right arguments because it didn't believe that the claim of right doctrine provided a basis to exclude income in the circumstances presented. Instead, the court only considered Hyatt's arguments under the trust fund doctrine. The tax court characterized that doctrine as a more tailored application of claim of right principles and reasoned that if Fund income wasn't excludable under the trust fund doctrine, it must be

income to Hyatt. The issue before us is therefore whether the claim of right doctrine operates as an independent basis to exclude income and, if so, how that doctrine interacts with the trust fund doctrine.

The classic formulation of the claim of right doctrine regards as income "earnings [received] under a claim of right and without restriction as to its disposition." *United States v. Skelly Oil Co.*, 394 U.S. 678, 680 (1969) (quoting *N. Am. Oil Consol. v. Burnet*, 286 U.S. 417, 424 (1932)). A taxpayer has a claim of right to funds when they "are received and treated … as belonging to him." *Healy*, 345 U.S. at 282. Here, the parties agree that the claim of right doctrine operates as one of income inclusion, i.e., that funds satisfying the claim of right doctrine are income. But they disagree about whether it also operates as one of income exclusion—in other words, whether failure to satisfy the claim of right doctrine means that the funds at issue may be excluded from income.

Based on *Commissioner v. Indianapolis Power & Light Company*, 493 U.S. 203 (1990), the answer is yes. There, the monies at issue were customer deposits held by a utility company, which the company refunded to customers upon request and if they demonstrated acceptable credit. See *id.* at 204. Considering whether those deposits were income to the company, the Supreme Court observed that, under the claim of right doctrine, a taxpayer "has received income" when he "acquires earnings, lawfully or unlawfully, without the consensual recognition, express or implied, of an obligation to repay and without restriction as to their disposition[.]" *Id.* at 209 (quoting the formulation of the claim of right doctrine given in *James v. United States*, 366 U.S. 213, 219 (1961), which in turn cites the classic formulation from *N. Am. Oil Consol.*, 286 U.S.

at 424). Applying that test to the customer deposits, the Court found that because the deposits were "acquired subject to an express 'obligation to repay,'" they were not income to the company. *Id.* The Court further emphasized that "whether these payments constitute income when received … depends upon the parties' rights and obligations at the time the payments are made." *Id.* at 211 (citation modified).

*Indianapolis Power* thus demonstrates that the claim of right doctrine is an independent basis to exclude income; the Court applied the doctrine and, finding it unmet, concluded that the funds at issue were not income to the taxpayer. See *id.* at 214; see also *Fla. Progress Corp. & Sub. v. Comm'r*, 114 T.C. 587, 599 (2000) (acknowledging *Indianapolis Power* as applying the claim of right doctrine to decide "whether" funds constitute income). Indeed, even before the Supreme Court decided *Indianapolis Power*, tax courts regarded use of the doctrine to exclude funds as "sound law." *Ancira v. Comm'r*, 119 T.C. 135, 138 (2002) (quoting *Diamond v. Comm'r*, 56 T.C. 530, 541 (1971), aff'd, 492 F.2d 286 (7th Cir. 1974)).

Satisfied that the claim of right doctrine operates as one of exclusion, we now consider the relationship between that doctrine and the trust fund doctrine. The trust fund doctrine is also one of exclusion. It holds that trust funds are excludable from income when two requirements are met. First, the taxpayer must be "obligated" to spend the money "for a specified purpose." *Affiliated Foods, Inc.*, 154 F.3d at 533 (quoting *Ford Dealers Advert. Fund, Inc. v. Comm'r*, 55 T.C. 761, 771 (1971)). Second, the taxpayer may not receive any "profit, gain, or other benefit" in return, unless it is merely "incidental and secondary." *Id.* at 531, 533 (citation modified); see also

*Angelus Funeral Home v. Comm'r*, 407 F.2d 210, 212 (9th Cir. 1969) (discussing "incidental" benefit).

We agree with the tax court that the trust fund doctrine is a more tailored application of claim of right principles. In effect, it's one way of determining that the taxpayer does not have a claim of right to the funds at issue. If the funds satisfy the trust fund doctrine, they do not "belong[] to" the taxpayer, because he is serving as a trustee for another. *Healy*, 345 U.S. at 282; see also *id.* at 283 (distinguishing funds received "under a claim of right as a trustee" and those received "under a claim of individual right"). What this means, as the tax court recognized, is that funds excludable from income under the trust fund doctrine are also excludable under the claim of right doctrine.

However, the opposite isn't true; funds that aren't eligible for exclusion under the trust fund doctrine may still be excludable under the claim of right doctrine. Put differently, the claim of right doctrine provides a broader basis for exclusion than the trust fund doctrine. Consider, for instance, commercial loans, which confer an economic benefit on the recipient. See *Indianapolis Power*, 493 U.S. at 208 (observing that a business "presumably does not borrow money" unless it believes it will profit). Despite that benefit—which would prohibit exclusion under the trust fund doctrine—loans are excluded from income. See *id.* at 208, 210. That's because loans come with a repayment obligation, which renders them excludable under the claim of right doctrine. See *id.* Indeed, the Supreme Court has explicitly rejected the idea that economic gains are always taxable as income. *Id.* at 214 ("[A] taxpayer does not realize taxable income from every event that improves his economic condition."). Rather, "the issue [of income] turns

upon the nature of the rights and obligations that [the tax-payer] assumed" when he received the money. *Id.* at 209.

Applying these observations to the decision below, we conclude that the tax court erred. It found that Fund income was income to Hyatt solely because Hyatt directly benefited from its use and thus failed to satisfy the trust fund doctrine. But the claim of right doctrine offers another, broader, basis to exclude income. The court therefore also should have considered Hyatt's arguments under the claim of right doctrine.

The case relied upon by the tax court, *Angelus Funeral Home*, 407 F.2d 210, doesn't suggest otherwise. There, the Ninth Circuit concluded that pre-funeral payments by individuals were income to a funeral home, in part because the funeral home immediately benefited from those payments. The tax court reads *Angelus Funeral Home* to support its notion that a more-than-incidental benefit is sufficient to decide that funds are income. But that reading disregards the substance of the Ninth Circuit's reasoning. The Ninth Circuit found not just benefit to the taxpayer, but also that the taxpayer's control over the funds—its "*absolute power* to benefit itself," using the funds "whenever it wished, subject only to limitations of purpose"—made it liable for taxation. *Id.* at 213 (emphasis added).

*Angelus Funeral Home* thus doesn't stand for the proposition that economic benefit alone is sufficient to make funds income. Rather, the Ninth Circuit's attention to taxpayer control over the funds adheres to the claim of right doctrine, which focuses not on benefit but on "the parties' rights and obligations at the time the payments are made." *Indianapolis Power*, 493 U.S. at 211 (citation modified). Here, though the tax court analyzed some aspects of Hyatt's control over the Fund

as part of its benefits analysis, it stopped well short of finding the kind of absolute power present in *Angelus Funeral Home*. And it never directly considered whether the funds were excludable under the claim of right doctrine.

Nor are we persuaded by the IRS's argument in support of the tax court's decision based on a line of cases that predates *Indianapolis Power*, beginning with *Commissioner v. Wilcox*, 327 U.S. 404 (1946), continuing with *Rutkin v. United States*, 343 U.S. 130 (1952), and culminating with *James*, 366 U.S. 213. Those cases do not, as the IRS argues, repudiate use of the claim of right doctrine to exclude income. In *James*, the Court explicitly "passed" on deciding whether the claim of right doctrine operated as a "touchstone of taxability," indicating that *Wilcox* and *Rutkin* didn't resolve this question. 366 U.S. at 216 n.7. And later, the Court affirmed that income may be excluded under the claim of right doctrine, applying the formulation of the doctrine given in *James*. See *Indianapolis Power*, 493 U.S. at 209.

To sum up: the trust fund doctrine is one (but not the only) way to show that a taxpayer lacks a claim of right to the funds at issue, and thus that they are not his income. It was therefore error for the tax court to treat Fund income as income to Hyatt based only on Hyatt's failure to satisfy the trust fund doctrine, without considering Hyatt's arguments under the claim of right doctrine.

Hyatt urges us to find that Fund income wasn't its income under the claim of right doctrine and reverse the tax court. But the tax court never applied the claim of right test and, in fact, explicitly declined to resolve issues relevant to that analysis, such as whether the Fund was subject to a legally enforceable use restriction. See *id.* (claim of right analysis

includes whether funds are received "without restriction as to their disposition"); *Skelly Oil Co.*, 394 U.S. at 680 (same). Because "we are a court of review, not first view," the proper course of action is therefore to return this case to the tax court for it to apply the correct legal test. *United States v. Dingwall*, 6 F.4th 744, 762 (7th Cir. 2021) (Kirsch, J., concurring) (citation modified); see *Frank v. Gaos*, 586 U.S. 485, 493 (2019) (per curiam) (remanding for resolution by the courts below in the first instance).

In a single sentence in its reply brief without further development, Hyatt also urges that reversal is warranted because the IRS failed to argue in the alternative about the outcome under the claim of right test. But an appellee's failure to brief an alternative ground for affirmance does not entitle the appellant to an automatic reversal. See *Pasha v. Gonzalez*, 433 F.3d 530, 535 (7th Cir. 2005). We must still assess the merits of the appeal, reversing only if the appeal is indeed meritorious. *Id.* Here, as stated before, the appropriate course of action is for the tax court to conduct the claim of right analysis in the first instance. We therefore vacate the tax court's decision and remand with instructions for that court to determine whether income to the Fund constituted income to Hyatt under the claim of right doctrine.

B

We close with thoughts on the interpretation of the trading stamp method as set forth in 26 C.F.R. § 1.451–4(a)(1). Strictly speaking, we don't need to reach this issue; the trading stamp method only comes into play if Fund income was Hyatt's income, which the tax court must decide anew. Nonetheless, we find it prudent to address the issue now, in the event that it arises again on remand. See, e.g., *Rodgers-Rouzier v. Am. Queen*

*Steamboat Operating Co.*, 104 F.4th 978, 991, 995 (7th Cir. 2024) (adopting a similar approach); *United States v. Leonard-Allen*, 739 F.3d 948, 955–56 (7th Cir. 2013) (same).

Section 1.451–4(a)(1) states that accrual method taxpayers issuing or selling trading stamps redeemable for "merchandise, cash, or other property" are eligible to use the trading stamp method to deduct related costs. To further define the scope of "other property," the tax court applied the canon of ejusdem generis, which uses a common element among preceding terms to narrow a catch-all term. See *Citizens Ins. Co. of Am. v. Wynndalco Enters., LLC*, 70 F.4th 987, 999–1000 (7th Cir. 2023) (defining the canon). As relevant here, the tax court reasoned that because merchandise and cash are both tangible, "other property" must refer only to tangible property. And since hotel stays and airlines miles are intangible, the court concluded that Hyatt couldn't use the trading stamp method.

Because we return this case to the tax court to decide whether Fund income was Hyatt's income at all, we need not decide whether Hyatt may use the trading stamp method. We observe only that the tax court erred when it interpreted "other property" to mean tangible property.

Assuming, without deciding, that there is ambiguity as to the meaning of "other property" such that application of ejusdem generis was warranted, the tax court's chosen theme—tangibility—doesn't work. See *United States v. Turkette*, 452 U.S. 576, 581 (1981) (noting that ejusdem generis is used only when there is uncertainty about meaning). Cash isn't always tangible; it refers to "[m]oney or its equivalent" and "balances in bank accounts." *Cash*, Black's Law Dictionary (12th ed. 2024). And the potentially intangible nature of cash is evident even from definitions contemporaneous to the

promulgation of § 1.451–4(a)(1) in 1972. See, e.g., *Cash*, Webster's Third New International Dictionary (1971) (defining cash as, among other things, "bank deposits"). Nor are we persuaded by the IRS's arguments based on the surrounding provisions of § 1.451–4(a)(1) and that regulation's history. Tangibility is not a common trait of cash and merchandise that can narrow the meaning of "other property" when interpreting § 1.451–4(a)(1).

The tax court therefore erred when it concluded that Hyatt couldn't use the trading stamp method because "other property" must be tangible. However, on remand the tax court has the flexibility to consider other arguments regarding Hyatt's eligibility to use the trading stamp method, should that issue arise.

VACATED AND REMANDED