128 T.C. No. 7


UNITED STATES TAX COURT


AFFILIATED FOODS, INC., A CORPORATION, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 12846-04.                    Filed March 29, 2007.


        P, a wholesale food purchasing cooperative, holds
one or more food shows a year at which member stores
and vendors selling to P meet.  The vendors offer
special show discounts to member stores placing orders
with P for the vendors' products at the food shows.
The special discount sometimes takes the form of a cash
payment from the vendor to the member store based on
the quantity of the vendor's products ordered.  Vendors
not bringing currency to the shows obtain cash for
those payments from promotional allowance accounts
established by the vendors with P or from checks given
to P and cashed by P.  R treats such P-delivered
currency as, first, being received by P as a vendor
rebate, second, being returned by P to the vendor, and,
third, being paid by the vendor to the member store.  R
considers the first step to result in a reduction in
P's cost of goods sold and the third step to be the
payment by P of a defective (nondeductible) patronage
dividend.  According to R, the defect is that the
payment is not out of P's net earnings.  The net result

of R's adjustments is an increase in P's gross income for each of the years in question in the amount of P-delivered currency paid by vendors to member stores.

1.  Held:  P is not collaterally estopped from challenging R's adjustments by our report in Affiliated Foods, Inc. v. Commissioner, T.C. Memo. 1996-505, affd. in part, revd. in part and remanded 154 F.3d 527 (5th Cir. 1998).

2.  Held, further, the payments that R charges P with making to member stores are properly characterized as trade discounts.  They were not paid with reference to P's net earnings but merely passed along the price adjustments that P was entitled to on account of the orders placed by the member stores at the food shows. They reduce P's gross sales and are not defective patronage dividends.

William A. Hoy, for petitioner.

George E. Gaspar and Mark E. O'Leary, for respondent.

HALPERN, Judge:  By notice of deficiency dated April 22, 2004, respondent determined deficiencies in petitioner's Federal income tax of $143,978, $166,493, and $11,101 for petitioner's taxable (fiscal) years ended September 30, 1991, October 2, 1992, and October 1, 1993, respectively (the audit years).  Petitioner is a corporation operating on a cooperative basis (a purchasing cooperative), whose shareholder-patrons operate retail grocery stores.  The issues for decision concern the proper treatment of certain payments made to petitioner's shareholder-patrons at food shows petitioner conducted during the audit years.

Respondent increased petitioner's gross income for each of the audit years on account of those payments and denied petitioner any offsetting deductions on the ground that the payments are nondeductible patronage dividends. In part, respondent defends against petitioner's assignments of error by claiming that petitioner is precluded from challenging respondent's adjustments on the basis of the outcome in Affiliated Foods, Inc. v. Commissioner, T.C. Memo. 1996-505, affd. in part, revd. in part and remanded 154 F.3d 527 (5th Cir. 1998); on remand T.C. Memo. 1999-136. Petitioner denies that it is precluded from challenging the adjustments and claims that it did not receive the payments, but, if it did, the payments either did not increase its gross income because of offsetting adjustments or, if they did increase its gross income, it was entitled to offsetting deductions.

Unless otherwise indicated, all section references are to the Internal Revenue Code as in effect for the audit years. The references to subchapter T are to that subchapter (sections 1381 through 1388) of chapter 1 of subtitle A of the Internal Revenue Code. Subchapter T deals with cooperatives and their patrons.

FINDINGS OF FACT

Some facts are stipulated and are so found.  The stipulation of facts, with accompanying exhibits, is incorporated herein by this reference.

Petitioner

Petitioner is a wholesale food purchasing cooperative that resells a variety of products to retail grocery stores in Texas, New Mexico, Oklahoma, Kansas, Colorado, and Arizona.  At the time the petition was filed, petitioner maintained its principal place of business in Amarillo, Texas.  Petitioner was incorporated in 1946 under the cooperative laws of the State of Texas to increase the bargaining power of member stores in their dealings with vendors.[1]  As of the time of the trial, petitioner had more than 239 shareholder-patrons, who operated approximately 715 member stores.  Petitioner does not own any interest in any member store.

Petitioner computes its taxable income using an accrual method of accounting and pursuant to the provisions of part I

---

[1]  The parties have stipulated that the term "member stores" refers to retail grocery stores that individually or as a group of related and associated retail grocery stores purchase food and other consumer products from or through petitioner and that are members of, or shareholders in, petitioner's cooperative system. They have further stipulated that the term "vendor" refers to manufacturers or other producers of food and other products sold to petitioner and member stores.  We shall adopt those locutions for purposes of this report.

(sections 1381 through 1383) of subchapter T, which addresses the tax treatment of cooperatives.

At the end of its fiscal year, petitioner returns the profits from its wholesale grocery purchasing business to its shareholder-patrons as patronage dividends.

Member Stores

Member stores determine independently of petitioner the types, brands, and quantities of the commodities that they purchase for resale to customers.

Promotional Allowance Accounts

From time to time, petitioner receives from some vendors and vendor representatives (without distinction, vendors)[2] funds to be spent in promoting the sale of products offered by those vendors. Petitioner deposits the funds in its own bank account and, on its books, treats the deposits as liabilities owed to the contributing vendors. Petitioner identifies the balance on hand for each contributing vendor in a set of accounts that it has designated the "promotional allowance accounts" (promotional allowance accounts).

---

[2] The parties have stipulated that the term "vendor representative" refers to an individual or entity who solicits and concludes sales of food and food products to petitioner and member stores on behalf of vendors, including all independent distributors, brokers, sales representatives, and agents of vendors. We shall adopt that locution for purposes of this report.

Discounts and Allowances

Petitioner negotiates with individual vendors to obtain discounts and allowances (without distinction, discounts) from the list prices advertised by the vendors. Thus, for example, for a limited time, a vendor of canned goods may offer $1 off on each case of its 16-oz. cans of peaches ordered.

Except with respect to certain special price discounts offered by vendors only at the food shows and described in the next paragraph, vendor discounts on merchandise purchased by petitioner reduce the price paid by (invoiced to) petitioner and are referred to by petitioner as "off-invoice" (off-invoice) discounts. Petitioner passes on to member stores off-invoice discounts it obtains from vendors unless the associated administrative costs exceed the amount of the discount. Hereafter, we shall use the term "usual discount" to describe any vendor discount other than the special price discounts offered only at the food shows.

Food Shows--General

Beginning in 1984 and extending at least through the audit years, petitioner held one or more food shows a year at which vendors and member stores met. One purpose of those shows was to encourage member stores to place orders with petitioner for the products that vendors promoted at the shows. The food shows held during the audit years were held in Amarillo, Texas.

Several weeks before each food show, petitioner sent invitations to member stores and vendors. Attendance at the shows by members, and participation in the shows by vendors, was voluntary. A vendor wishing to participate in a food show entered into an agreement with petitioner under which the vendor agreed to pay a participation fee, rent and decorate a booth at the show, and offer to member stores discounts on the products that the vendor offered at the show. Those discounts, although negotiable, were subject to petitioner's approval and had to be greater than the usual discounts. The special show discounts, although limited to orders placed at the food shows, were, like the usual discounts, based on the quantity of merchandise ordered.

Also, in preparation for each food show, each participating vendor provided petitioner with a "deal data sheet", which, among other things, showed the products the vendor was promoting and the per-unit show discount (referred to by petitioner as "show money" (show money)) offered for each product. Petitioner had the right to reject individual product items. Vendors had discretion to make show money available to member stores in one of two ways: (1) a credit against the purchase price of the product to be reflected on the invoice to be issued to the member store by petitioner on fulfillment of the order after the food show (i.e., an off-invoice discount), or (2) an immediate payment

at the food show, in currency or by check, from the vendor to the member store. In the case of an off-invoice discount, petitioner stood as an intermediary between the vendor and the member store, reducing the price it charged the member store to reflect the off-invoice discount and receiving an equal reduction from the vendor in the price it charged petitioner. Petitioner made no explicit price reduction if the vendor agreed to pay show money directly to the member at the food show.

Vendors exercised their discretion with respect to show money by indicating their choices on the deal data sheets they submitted. Information from deal data sheets was transferred by petitioner to individual sheets for each vendor. Those sheets were then reproduced and bound into books (show books) for distribution to members attending the food show.

Each sheet in the show book had attached to it a perforated strip (tear strip) that the member store could detach and use to order from petitioner an item (or items) described on the associated sheet. The member store delivered the tear strip to the appropriate vendor, who, if an immediate payment of show money was called for, made that payment and then delivered the tear strip to petitioner for fulfillment of the order. Petitioner entered the necessary information from the tear strip into its billing and accounting records and, in most cases, then discarded the tear strips. Petitioner ordered additional

merchandise from the vendor, if necessary, and filled the order on the date requested by the member store.  Petitioner invoiced the member store for the shipment, reflecting on the invoice credit for the appropriate amount of show money if, and only if, that amount had not already been paid by the vendor to the member store.

A member store had discretion not to receive show money in currency or by check from a vendor who had elected to offer show money that way.  A member store had no discretion, however, to demand a payment from a vendor if the vendor had elected the off-invoice method of offering show money.

Petitioner's Profit on Sales to Member Stores

Petitioner profits on sales to member stores by marking up the prices it charges member stores from the prices it pays vendors.  Except with respect to off-invoice discounts resulting from show money offered at the food shows, petitioner applies its customary markup to the price it charges a member store; i.e., the markup is applied to the vendor's list price less the usual discount obtained by petitioner.  With respect to show money, petitioner applies any off-invoice discount only after adding its own markup.  Thus, petitioner calculates that its margin (the difference between the cost and selling price) and its markup on food show orders are the same if a member store receives show

money in currency or check or if the member store elects an off-invoice credit.[3]

---

[3] The following table is based on a table prepared by Tammie Coffee, petitioner's chief financial officer, to illustrate the point in the text.

Consolidated Foods, Inc.
Comparison of gross profit on AFI's ledger of off-invoice/at-show payment:

Item #27024

|  | Off invoice | At show |
|---|---|---|
| Sale to AFI customer: |  |  |
| List price | $76.20 | $76.20 |
| Less: usual discount | 1.20 | 1.20 |
| Subtotal: Price before markup | 75.00 | 75.00 |
| Add Markup: 7.5% | 5.25 | 5.25 |
| Subtotal | 80.25 | 80.25 |
| Less: Off-invoice show money discount | .75 | n/a |
| Total amount billed to member store | 79.50 | 80.25 |
| | | |
| AFI purchase price from vendor: | | |
| List cost | 76.20 | 76.20 |
| Less: | | |
| Usual discount | 1.20 | 1.20 |
| Off-invoice show money discount | .75 | n/a |
| Total cost of goods sold | 74.25 | 75.00 |
| | | |
| Gross profit on AFI general ledger (margin): | | |
| Amount billed to member store | 79.50 | [1]80.25 |
| Less: cost of goods sold | 74.25 | 75.00 |
| Total margin | 5.25 | 5.25 |

[1] We note that, if it is assumed that the member store receives a payment of $0.75 at the food show, it would have to subtract that receipt ($0.75) from the amount it pays petitioner ($80.25) to determine its cost for the goods it purchased ($79.50).

Food Shows; Currency

The currency used by vendors to pay show money had three possible sources: (1) the vendor's promotional allowance account, if the vendor gave petitioner written instructions to charge a specific amount against the account and to deliver currency in that amount to the vendor at the food show, (2) a vendor's check, given by the vendor to petitioner for the specific purpose of providing currency to the vendor at the food show, and (3) currency brought to the food show by the vendor and taken from an account of the vendor unknown to petitioner. In the first two cases, petitioner obtained the necessary currency from the Amarillo National Bank (the bank).

Petitioner obtained currency from the bank in denominations sufficient to meet the individual vendors' requests for currency in specific denominations. Petitioner placed the currency in locked bank bags identified with numbers unique to each vendor. Immediately before a food show began, vendors retrieved their bags from petitioner at a central location after, first, verifying that the bag's contents were as expected and, second, signing a receipt.

At the conclusion of the food show, vendors who had received bank bags from petitioner returned to petitioner those bags and any currency they wanted to deliver to petitioner. Petitioner issued written receipts for the bank bags and currency returned.

Respondent's Adjustments

Respondent attached to the notice of deficiency an explanation of his adjustments to petitioner's tax liabilities for the audit years. The explanation states that respondent has determined that "the food show distributions" to petitioner's shareholders are both income to petitioner and nondeductible patronage dividends paid by it to its members. Therefore, the explanation continues, petitioner's taxable income is increased by $421,973, $489,685, and $144,122, for 1991, 1992, and 1993, respectively.

OPINION

I. Introduction

During the audit years, petitioner, a wholesale food purchasing cooperative, conducted one or more food shows a year at which member stores met with vendors. Among other things, the food shows were designed to encourage member stores to order from petitioner the vendors' products offered at the shows. Pursuant to an agreement with petitioner, each vendor attending a show was required to offer member stores special show discounts on the vendor's products offered at the show. Petitioner referred to those special show discounts as "show money". Vendors could make show money available to member stores in one of two ways. First, a vendor could offer a member store a discount on an order placed with petitioner at the show, petitioner having agreed to honor

the discount (referred to by petitioner as an "off-invoice" discount) when it invoiced the member store upon fulfillment of the order after the show. Petitioner would receive an identical discount from the vendor. Second, instead, the vendor could offer to pay the member an amount equal to the off-invoice discount immediately upon its executing an order to be placed with petitioner. In that case, no invoice either from petitioner to the member store or from the vendor to petitioner would reflect the payment.

We are concerned here only with show money made available to member stores in the second way; i.e., by an immediate payment by a vendor to a member store. Moreover, we are concerned with those payments only if they were made in currency (i.e., not by check), and then only if the currency was delivered by petitioner to the vendor at the start of the food show. We are not, therefore, concerned with payments out of currency brought to a food show by a vendor. The currency delivered by petitioner to a vendor at the start of a food show (which we shall refer to as petitioner-delivered currency) had one or perhaps both of two sources: (1) a charge against the vendor's promotional allowance account, at the direction of the vendor, for the specific purpose of providing the vendor with currency at the food show, and, (2) checks received from the vendor and cashed by petitioner for the same purpose. We shall use the terms "promotional-allowance

currency" and "vendor-check currency" to refer to petitioner-delivered currency attributable to the former and the latter of those sources, respectively.

While, in the notice of deficiency, respondent explained that his adjustments to petitioner's Federal income tax for the audit years were based on his determination that petitioner's "food show distributions" to its shareholders are income to petitioner (and nondeductible patronage dividends paid to its members), respondent did not explain how he computed those adjustments. The parties have stipulated respondent's method of computation:

> Respondent increased Petitioner's taxable income in each of the years in issue by an amount equal to the difference between: (a) the sum of (i) the cash amounts withdrawn from the Promotional Allowance Accounts and (ii) the checks delivered to Petitioner by Vendors * * * in anticipation of the Food Shows, over (b) the cash returned to the Petitioner at the conclusion of the Food Shows by the same Vendors * * * .[4]

We shall first address respondent's claim that petitioner is precluded from challenging respondent's adjustments. Since we believe that petitioner is not so precluded, we shall then address the parties' other claims.

---

[4] The parties' stipulation repeats the explanation as follows: "Respondent's adjustment to Petitioner's income for the years in issue is, therefore, the difference between the checks and withdrawals from the Promotional Allowance Accounts provided by Vendors * * * to Petitioner reduced by the cash returned by the Vendors * * * at the conclusion of the Food Shows."

II. <u>Issue Preclusion</u>

   A.  <u>Introduction</u>

   Respondent asserts that the Court in <u>Affiliated Foods, Inc.</u>
<u>v. Commissioner</u>, T.C. Memo. 1996-505, found that payments by
vendors to member stores of petitioner-delivered currency during
petitioner's 1989 and 1990 tax years were both gross income to
petitioner and nondeductible payments of patronage dividends by
petitioner to its shareholders.  Relying on the doctrine of issue
preclusion (or collateral estoppel), respondent argues that
petitioner is precluded from relitigating those issues.  Since,
during the audit years, vendors also made payments of petitioner-
delivered currency to member stores, respondent argues that those
payments are items of gross income to petitioner for those years
and nondeductible payments of patronage dividends.

   B.  <u>The Doctrine of Issue Preclusion</u>

   In <u>Monahan v. Commissioner</u>, 109 T.C. 235, 240 (1997), we
said:

>    The doctrine of issue preclusion, or collateral
> estoppel, provides that, once an issue of fact or law
> is "actually and necessarily determined by a court of
> competent jurisdiction, that determination is
> conclusive in subsequent suits based on a different
> cause of action involving a party to the prior
> litigation." <u>Montana v. United States</u>, 440 U.S. 147,
> 153 (1979) (citing <u>Parklane Hosiery Co. v. Shore</u>, 439
> U.S. 322, 326 n.5 (1979)).  Issue preclusion is a
> judicially created equitable doctrine whose purposes
> are to protect parties from unnecessary and redundant
> litigation, to conserve judicial resources, and to
> foster certainty in and reliance on judicial action.
> See, e.g., <u>id.</u> at 153-154; <u>United States v. ITT</u>

Rayonier, Inc., 627 F.2d 996, 1000 (9th Cir. 1980). This Court in Peck v. Commissioner, 90 T.C. 162, 166-167 (1988), affd. 904 F.2d 525 (9th Cir. 1990), set forth the following five conditions that must be satisfied prior to application of issue preclusion in the context of a factual dispute * * * :

"(1) The issue in the second suit must be identical in all respects with the one decided in the first suit.

(2) There must be a final judgment rendered by a court of competent jurisdiction.

(3) Collateral estoppel may be invoked against parties and their privies to the prior judgment.

(4) The parties must actually have litigated the issues and the resolution of these issues must have been essential to the prior decision.

(5) The controlling facts and applicable legal rules must remain unchanged from those in the prior litigation. * * * "

C. Discussion

1. Petitioner's Argument

Petitioner concedes that the first three conditions are satisfied. Petitioner argues that the fourth condition is not satisfied since, by assigning error to respondent's failure to allow it offsetting deductions or adjustments to gross income from sales--if we should decide in the first place that petitioner received anything on account of the vendors' payments to members of petitioner-delivered currency--petitioner has raised issues that were neither litigated nor resolved in the prior litigation. Petitioner argues that the fifth condition is not satisfied since the controlling facts in this case are not the same as in the prior case.

2. <u>Points Not at Issue in the Prior Litigation</u>

"Collateral estoppel applies only to an issue that was actually litigated and determined in a prior action, not to an issue that might have been litigated." <u>Anderson, Clayton & Co. v. United States</u>, 562 F.2d 972, 992 (5th Cir. 1977); see also <u>Commissioner v. Sunnen</u>, 333 U.S. 591, 597-598 (1948). As put by the Supreme Court in <u>Commissioner v. Sunnen</u>, <u>supra</u> at 598: "Since the cause of action involved in the second proceeding is not swallowed by the judgment in the prior suit, the parties are free to litigate points which were not at issue in the first proceeding, even though such points might have tendered and decided at that time." Moreover, it is well settled that each taxable year is the origin of a new liability and of a separate cause of action. <u>Id.</u>; see also <u>Estate of Hunt v. United States</u>, 309 F.2d 146, 148 (5th Cir. 1962). In <u>Cloud v. Commissioner</u>, T.C. Memo. 1976-27, we held that the taxpayers were not collaterally estopped from challenging the Commissioner's disallowance of their deductions of certain expenses under a theory different from the losing theory they had advanced in litigation concerning the same types of expenses for prior years.

Petitioner's assignments of error to respondent's failure to allow it offsetting deductions or adjustments to gross income from sales do raise issues that were neither litigated nor resolved in the prior litigation. Although petitioner did raise

the issue of an offsetting deduction in <u>Affiliated Foods, Inc. v.</u> <u>Commissioner</u>, <u>supra</u>, and was sustained on that issue with respect to petitioner-delivered currency given to one vendor, petitioner failed on brief to argue the issue with respect to vendors generally and, on account of that failure, was deemed to have conceded the issue. <u>Id.</u> n.11. The issue of offsetting deductions was not fully litigated in the prior litigation, and petitioner is not precluded from raising it here. See <u>Coors v.</u> <u>Commissioner</u>, 60 T.C. 368, 392 (1973) (Commissioner not barred from litigating capitalization issue that, in prior litigation between parties, he had abandoned, where no findings had been made by Court with regard to issue, and it was not necessary to result reached), affd. 519 F.2d 1280 (10th Cir. 1975). Nor is petitioner precluded from arguing for an offsetting adjustment to gross income from sales, because that issue was not raised in the prior litigation. See <u>Monahan v. Commissioner</u>, <u>supra</u> at 240.

### 3. Difference in Controlling Facts

The fact that petitioner is free to argue for offsetting deductions or adjustments does not mean that it is free to argue that it has no gross income (or no gross receipts) on account of vendor payments to member stores of petitioner-delivered currency if that issue was settled in the prior litigation. See <u>Jaggard</u> <u>v. Commissioner</u>, 76 T.C. 222, 224 (1981) (issue-by-issue determination of whether collateral estoppel applies).

Nevertheless, petitioner claims that it is free to so argue since the facts controlling the issue here are different from those in Affiliated Foods, Inc. v. Commissioner, T.C. Memo. 1996-505. In that case, we found facts that, in much the same terms we use today, describe food shows petitioner put on during its 1989 and 1990 taxable years (1989 and 1990, respectively). We described show money (although we did not use that term) much as we describe it today, although we included no specific description of off-invoice discounts. We described the order forms (deal data sheets) submitted by vendors and said "there was no negotiating" after the order forms were submitted. We described the procedures for supplying petitioner-delivered currency much as we describe them today. We also said:

> In both instances [i.e., in the case of both promotional-allowance currency and vendor-check currency], petitioner required the vendors to sign for the cash received, and, most importantly, it also required any unused cash to be returned to it at the end of the food show. This was not a check-cashing service. Unlike a check-cashing service, petitioner ensured that the check proceeds were either paid to its shareholders or returned to it. [Emphasis added.]

We ended our discussion of petitioner-delivered currency by concluding:

> Petitioner was not a nontaxable intermediary with respect to the food show cash disbursements arising from the promotional accounts. * * * Similarly, as for the food show cash disbursements arising from the check-cashing transactions, petitioner exercised dominion and control over these funds, as evidenced by the return of any "unused" cash. Thus, these amounts

must also be included in petitioner's income.  * * *
[Emphasis added.]

Petitioner argues that the important facts we relied on in Affiliated Foods, Inc. v. Commissioner, supra, to support our conclusion that it exercised dominion and control over the petitioner-delivered currency are not present in this case. Petitioner claims that, unlike what we found for 1989 and 1990, during the audit years, (1) it did not require vendors to return to it any remaining petitioner-delivered currency not paid to member stores, and (2) although it had the final say, it did negotiate with vendors the amounts of show money the vendor would give.  It also claims that, with respect to its 1993 food shows, vendors gave it no checks.  While we are not certain about petitioner's third claim, we have made findings consistent with its first two claims.  With respect to its first claim, we have found:  "At the conclusion of the food show, vendors who had received bank bags from petitioner returned to petitioner those bags and any currency they wanted to deliver to petitioner."  See supra p. 11 (emphasis added).  Our finding is almost a verbatim recitation of a stipulated fact.  From that stipulation, we draw the inference that vendors had discretion to, but were not required to, return to petitioner at the end of a food show any undistributed petitioner-delivered currency, and we so find.

Whatever limited power vendors had to negotiate food show money and, more importantly, their right to retain any

undistributed petitioner-delivered currency distinguish the facts before us from the facts we relied on in Affiliated Foods, Inc. v. Commissioner, supra.  In the prior litigation, we found "most" important the requirement that undistributed petitioner-delivered currency be returned; that requirement evidenced to us petitioner's exercise of dominion and control over petitioner-delivered currency.[5]  The return requirement ensured that petitioner-delivered currency would either be paid to member stores or returned to petitioner.  In the present litigation, we cannot be equally confident that petitioner-delivered currency not returned to petitioner was paid to member stores, since

_____

[5]  In Affiliated Foods, Inc. v. Commissioner, T.C. Memo. 1996-505, affd. in part, revd. in part and remanded 154 F.3d 527 (5th Cir. 1998), we found that amounts received from vendors and credited to the vendors' promotional allowance accounts were items of gross income to petitioner when received.  We were reversed on that point by the Court of Appeals for the Fifth Circuit.  Affiliated Foods, Inc. v. Commissioner, 154 F.3d 527 (5th Cir. 1998).  Respondent has made no adjustments for amounts similarly received during the audit years, and we assume that, at least for purposes of this case, respondent accepts the Court of Appeals' conclusion that vendors retained control of funds credited to the promotional allowance accounts and receipt of those funds did not give rise to gross income to petitioner. Id. at 533.  We assume further that an amount equal to any petitioner-delivered currency that a vendor chose to return to petitioner following a food show during the audit years was either returned to the vendor or credited to its promotional allowance account (and, therefore, petitioner retained no control over any currency returned to it).  We make those assumptions because, for the audit years, respondent has increased petitioner's income by only the excess of the petitioner-delivered currency over the amount of cash returned by vendors to petitioner at the conclusion of the food show.

vendors were under no obligation to return to petitioner any petitioner-delivered currency not paid to member stores or to account to petitioner for their disposition of petitioner-delivered currency. Petitioner's dominion and control over petitioner-delivered currency was different in the audit years than it was in the years subject to the prior litigation. Denying a party the right to litigate an issue is a matter that requires circumspection. Monahan v. Commissioner, 109 T.C. at 242. On balance, we think that the interests of justice are better served by allowing petitioner to litigate the control issue afresh, in the light of the difference in facts from the prior litigation. See, e.g., Alexander v. Commissioner, 224 F.2d 788, 793 (5th Cir. 1955) (interests of justice not served by holding barring taxpayer from showing change in facts concerning partnership agreement subject to prior proceeding), affg. in part, revg. in part and remanding 22 T.C. 318 (1954). Affiliated Foods, Inc. v. Commissioner, supra, does not preclude petitioner from litigating the inclusion in gross income of petitioner-delivered currency.

D. Conclusion

Respondent's affirmative defense of issue preclusion fails.

III.  Discussion

A.  Arguments of the Parties

Respondent argues that, for each of the audit years, petitioner has an item of gross income on account of petitioner-delivered currency because petitioner "asserted control over those funds and used the vendor representatives as conduits to make 'disguised patronage dividends' to its member stores at the food shows."  Respondent lists the following as among the important operative facts:[6]

> Petitioner negotiated for the food show rebates and thereby provided for the direct payment of monies from vendors to members that would otherwise have accrued to Affiliated as earnings, i.e., rebates from vendors to Affiliated for product purchased by Affiliated.
>
> A member received food show rebates based on the amount of product purchased at the show.  The greater the product purchases meant more food show rebates.
>
> Members committed to make purchases at the food show and subsequently bought the product through Affiliated.
>
> In this manner, a member received rebates based on the amount of product purchased through Affiliated, and
>
> Affiliated was able to provide a patronage dividend without complying with the statutory requirements.

While petitioner disagrees that it paid any patronage dividends or asserted control over the petitioner-delivered currency (petitioner argues that it was only delivering to

---

[6]  Paragraph numbers and citations of respondent's proposed findings of fact are omitted.

vendors their own money, either reducing the balance of a vendor's promotional allowance account or delivering the proceeds of a vendor's check), its description of the facts does not differ markedly from respondent's:

> The payments in question were simply price rebates; no different than the price discounts and rebates afforded Member Stores on a day-to-day basis throughout the year. The day-to-day rebates and price discounts also represented value passing from Petitioner, who granted them, to the Member Stores, who purchased the goods to which the rebates and discounts attached. * * *

If we should find that petitioner exercised sufficient control over the petitioner-delivered currency to cause us to conclude that petitioner had a receipt in an equal amount, petitioner argues that either the receipt did not increase its gross income because of an offsetting adjustment (either an increase in petitioner's cost of goods sold or a reduction in the amount of its receipts from sales to member stores) or, if the receipt did increase its gross income, it had an offsetting deduction.

B. Discussion

1. Control

Petitioner organized the food shows and required vendors wishing to participate to offer special deals (show money) on their products offered and ordered at the show. In the case of an off-invoice discount, petitioner accorded the member store the discount and, in turn, was accorded an equal discount by the

vendor. A vendor could choose, however, to make an immediate payment of show money to a member store, either in currency or by check. If the vendor chose currency, the currency either had come from petitioner (i.e., petitioner-delivered currency) or was provided by the vendor itself (vendor-provided currency). If payment was of petitioner-delivered currency, respondent's argument is that the vendor was not using its own money to pay show money: The vendor was using petitioner's money to pay show money. As respondent sees it, simultaneously with the vendor's making a payment of petitioner-delivered currency to a member store, the vendor rebated an equal amount to petitioner, which petitioner returned to the vendor under an earlier direction that the vendor pay the amount to the member store on petitioner's behalf.

Respondent justifies such indirection on the ground that petitioner asserted sufficient control over the circumstances surrounding the vendors' receipts of petitioner-delivered currency that the vendors should be viewed as nothing more than petitioner's agents engaged to pay to the member stores rebates from moneys (rebates) first received by petitioner. Respondent does not pin down the nature of that control, however, and the fact that respondent does not similarly treat the vendors as petitioner's agents in the case of vendor-provided currency or checks (hereafter, without distinction, vendor-provided currency)

paid to member stores leaves us less than clear as to the substance of respondent's argument concerning control.

As set forth supra in section III.A., respondent claims as a fact: "Petitioner negotiated for the food show rebates and thereby provided for the direct payment of moneys from vendors to members that would otherwise have accrued to Affiliated as earnings, i.e., rebated from vendors to Affiliated for product purchased for sale by Affiliated." While it is true that petitioner negotiated with respect to show money and had the right to final approval and, therefore, exercised some control over show money, petitioner's authority and rights were the same irrespective of whether the vendor chose to use petitioner-delivered or vendor-provided currency to pay show money to member stores. Yet respondent's adjustments increasing petitioner's income on account of rebates petitioner is deemed to have received is made only with regard to petitioner-delivered currency (and without regard to vendor-provided currency). If negotiation and approval with respect to show money signify control, then we do not see why those factors do not equally signify control with respect to vendor-delivered currency. The singular distinction between petitioner-delivered and vendor-provided currency is that the former came to vendors from petitioner's hands. As explained in the next two paragraphs, we do not see that distinction as justifying different treatment.

With respect to each vendor receiving petitioner-delivered currency, the delivery was of either, or both of, promotional-allowance currency or vendor-check currency.  A vendor retained control of its promotional allowance account,[7] and only upon its specific instruction was petitioner authorized to charge the account and deliver a specified amount of currency to the vendor at the food show.  Petitioner had no discretion in the matter.  Petitioner likewise lacked discretion with respect to the proceeds of a vendor's check that it delivered to the vendor at the food show.  In N. Am. Oil Consol. v. Burnet, 286 U.S. 417, 424 (1932), the Supreme Court announced what has been termed the "claim-of-right" doctrine:

> If a taxpayer receives earnings under a claim of right and without restriction as to its disposition, he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent.  * * *

The doctrine does not apply to amounts a taxpayer receives as a mere conduit or agent for transmittal to another.  E.g., Apothaker v. Commissioner, T.C. Memo. 1985-445.  Indeed, in a case predating subchapter T and upholding the payer corporation's exclusion from gross income of patronage based refunds, the Court of Appeals for the Fifth Circuit grounded its analysis in part on the following proposition:  "'[I]n order for receipts to

---

[7]  See supra note 5.

constitute taxable income to a taxpayer there must be (1) the presence of a claim * * * [of] right to such receipts, and (2) the absence of a definite, unconditional obligation to pay the same to another.'" United States v. Miss. Chem. Co., 326 F.2d 569, 573 (5th Cir. 1964) (quoting Farmers Coop. Co. v. Birmingham, 86 F. Supp. 201, 214 (N.D. Iowa 1949) (citing Commissioner v. Wilcox, 327 U.S. 404 (1946))).

Petitioner-delivered currency came into petitioner's hands on the understanding that petitioner would in short order deliver the currency to the vendors whose promotional allowance accounts had been debited, or whose checks had been cashed, to provide the currency. Petitioner lacked meaningful control over petitioner-delivered currency, and neither its receipt of checks from vendors, its withdrawal of currency from the bank, nor its delivery of that currency to vendors can, alone or together, serve as the basis for charging petitioner with having received rebates from vendors. With respect to this narrow aspect of the show money operation, petitioner merely served as a conduit, providing the vendors with liquidity from their own funds. We do not see that petitioner effectively exercised any more control over petitioner-delivered currency than it did over vendor-provided currency.

We end our discussion of control inconclusively because, so far as we understand respondent's control argument, it is

unpersuasive:  We do not see a sufficient difference between petitioner's control over petitioner-delivered and vendor-provided currency that they should be treated differently, yet that is what respondent has done.  Nevertheless, we are mindful that in affirming our prior treatment of show money in Affiliated Foods, Inc. v. Commissioner, 154 F.3d at 533, the Court of Appeals remarked that, by negotiating the terms of show money payments, petitioner provided for the direct payment of moneys from vendors to member stores that otherwise would have accrued to petitioner as earnings.  Even were we to ignore respondent's failure to treat petitioner-delivered and vendor-provided currency equivalently, however, and to credit petitioner with control over petitioner-delivered currency, we believe that petitioner prevails for the reasons stated below.

2.  Rebates

Both petitioner and the member stores are merchants.  A merchant computes its gross income from sales during a year by subtracting from its revenue from sales the cost of the goods sold.  See sec. 1.61-3(a), Income Tax Regs.  A purchase price adjustment or a price rebate that a taxpayer receives with respect to goods that it has purchased for resale is not, itself, an item of gross income but, instead, is treated as a reduction in the cost of the goods sold.  See, e.g., Dixie Dairies Corp. v. Commissioner, 74 T.C. 476, 492 (1980).

In his reply brief, respondent describes how petitioner should have accounted for the rebates that respondent deems petitioner received on account of the vendors' currency payments to member stores. Without distinguishing between petitioner-delivered and vendor-provided currency, respondent states: "Affiliated should have reduced its cost of goods sold to reflect these currency rebates and thereby increased its income. This is what happened, for example, with those rebates that took the form for a reduction in the invoice price (i.e., 'off invoice')." That, however, is <u>not</u> what happened with respect to off-invoice discounts. Petitioner's chief financial officer, Tammie Coffee, gave uncontradicted and convincing testimony that, in the case of show money paid by way of an off-invoice discount, the discount reduced <u>both</u> the cost of the goods sold <u>and</u> petitioner's receipt from the sale of the goods (its gross receipt). The net effect, of course, is that any off-invoice discount had <u>no</u> effect on petitioner's gross income.[8] Nor did any payment of show money from vendor-provided currency have any effect on gross income, since petitioner ignored it in determining both the cost of the

---

    [8] Because petitioner had a fixed right to reimbursement at the time it accorded an off-invoice discount to a member store, there should be no difference between the time it accrued the receipt from the sale and the time it reduced its cost for the goods sold. See Rev. Rul. 84-41, 1984-1 C.B. 130 (citing <u>Wolfors v. Commissioner</u>, 69 T.C. 975, 983-985 (1978)).

goods sold and the gross receipt from the sale, and respondent has not challenged that treatment.

While he has misunderstood how petitioner accounted for the off-invoice discounts, we assume that respondent would agree that, as between petitioner and the vendors, any off-invoice discounts or deemed rebates were trade discounts, which reduced the cost to petitioner of merchandise purchased from the vendors. See sec. 1.471-3(b), Income Tax Regs. (cost of merchandise purchased during taxable year is invoice price less "trade" and certain other discounts); Rev. Rul. 84-41, 1984-1 C.B. 130, 130 ("Trade discounts represent adjustments to the purchase price granted by a vendor."). Putting aside for the moment petitioner's status as a cooperative corporation, it is difficult to see why the rebates that respondent deems petitioner received from vendors and passed on without alteration to member stores on sales made to those stores should not also be deemed to reduce petitioner's receipts from those sales. We have found that the special show discounts were based on the quantity of merchandise member stores ordered from petitioner at the food shows. The discounts were an inducement to greater sales. If petitioner is deemed to have paid any show money, its purpose was to increase sales (and profits[9]) by reducing prices. Those deemed payments,

_____

[9] Petitioner ignored special show discounts in applying its markup to food show sales. See supra note 3.

therefore, should be considered as reducing its receipts from sales.

We cannot improve on the Commissioner's explanation in Rev. Rul. 2005-28, 2005-1 C.B. 997, as to why any deemed payments should be considered as reducing petitioner's receipts from sales. In that revenue ruling, the Commissioner holds that Medicaid rebates incurred by a pharmaceutical manufacturer are purchase price adjustments that are subtracted from gross receipts in determining gross income. The Commissioner states:

> In Pittsburgh Milk Co. v. Commissioner, 26 T.C. 707 (1956), * * * the Tax Court addressed whether allowances, discounts, or rebates paid by a milk producer to certain purchasers of its milk, in willful violation of state law, are adjustments to the purchase price of the milk resulting in a reduced sales price, or ordinary and necessary business expenses under § 162 (in which case no deduction would be allowed under the rules of § 162(c)). The court reasoned that for income derived from the sale of property, in determining gain, the amount realized must be based on the actual price or consideration for which the property was sold and not on some greater price for which it possibly should have been, but was not, sold. The court focused on the facts and circumstances of the transaction, what the parties intended, and the purpose or consideration for which the allowance was made. The court found that the allowances were part of the sales transaction and concluded that gross income must be computed with respect to the agreed net prices for which the milk was actually sold. Thus, under Pittsburgh Milk, where a payment is made from a seller to a purchaser, and the purpose and intent of the parties is to reach an agreed upon net selling price, the payment is properly viewed as an adjustment to the purchase price that reduces gross sales. [Id., 2005-1 C.B. at 997; emphasis added.]

We must, therefore, consider whether petitioner's status as a cooperative requires a different result.

### 3. Cooperative Status

### a. Introduction

Section 1382 addresses the taxable income of cooperatives, such as petitioner, to which section 1381 applies (individually, a subchapter T cooperative). Section 1382(a) addresses the gross income of subchapter T cooperatives. In pertinent part, it provides:

> SEC. 1382(a). Gross Income.--Except as provided in subsection (b), the gross income of any organization to which this part applies shall be determined without any adjustment (as a reduction in gross receipts, an increase in cost of goods sold, or otherwise) by reason of any allocation or distribution to a patron out of the net earnings of such organization * * * .

Subsection (b)(1) of section 1382 provides an exception that, in effect, allows a deduction from gross income for the payment of "patronage dividends". That term, in pertinent part, is defined in section 1388(a) to mean amounts paid by a subchapter T cooperative:

> (1) on the basis of quantity or value of business done with or for such patron,
>
> (2) under an obligation of such organization to pay such amount, which obligation existed before the organization received the amount so paid, and
>
> (3) which is determined by reference to the net earnings of the organization from business done with or for its patrons.

    b.  Respondent's Argument:  Defective Patronage
        Dividends

As we understand respondent's argument, it is that the trade discounts that respondent deems petitioner to have received from the vendors and to have passed on without alteration to member stores on sales made to those stores do not reduce petitioner's gross receipts from those sales because those passed-on rebates were defective patronage dividends.

According to respondent, the passed-on rebates resembled patronage dividends in two respects.  First, they were patronage based.  Indeed, respondent proposes that we find that the deemed rebates "were based on the amount of product purchased, or business done, by [petitioner's shareholder-patrons]".  Second, they were prearranged, at least in the sense that they were part of the negotiated sale price of merchandise ordered by member stores at the trade shows and were consistent with petitioner's policy of passing on to member stores discounts obtained from vendors.  Respondent argues, however: "[P]etitioner cannot show that the dividends were calculated by reference to the net earnings of the cooperative from business done with or for its patrons."  Therefore, respondent concludes:  "The amounts in question do not qualify for the patronage dividend deductions."  Respondent adds:  "Once it has been determined that the amounts at issue were disguised [we would say "defective"] patronage dividends the analysis should stop."

But if the analysis stops there, then respondent may well lose.  If the passed-on rebates are defective patronage dividends because petitioner cannot show that they were calculated with reference to its patronage-based net earnings, then, perhaps, they were not calculated with reference to those earnings.  If not, then it would appear that section 1382(a) imposes no restriction on petitioner's reducing its gross receipts from sales to member stores to reflect what respondent must concede are price adjustments (i.e., trade discounts).[10]  Nor has respondent advanced an argument separate from his defective patronage dividend argument that any provision of subchapter T prevents a subchapter T cooperative from subtracting trade

---

[10]  Moreover, in Pittsburgh Milk Co. v. Commissioner, 26 T.C. 707 (1956), and cases following that decision, the Tax Court has held that when, as added consideration for a sale, a seller rebates part of a customer's purchase price or pays that customer cash from a separate account, the amount of the rebate is not a business expense, potentially deductible under sec. 162, but, rather, a reduction of selling price.  Regardless of whether the rebate is legal (viz, whether sec. 162(c) would disallow deduction of such an illegal rebate by that seller/taxpayer), the seller is treated as if it never received more than the net selling price (i.e., the stated selling price, less the rebate); the amount of the rebate is excluded from the seller's gross income.  See generally Max Sobel Wholesale Liquors v. Commissioner, 630 F.2d 670, 671-672 (9th Cir. 1980), affg. 69 T.C. 477 (1977).  In Max Sobel, 630 F.2d at 672, the Court of Appeals for the Ninth Circuit further observed:  "The Pittsburgh Milk doctrine has the obvious merit of reflecting economic reality."  The Commissioner has acquiesced to the Tax Court's holdings in Max Sobel and Pittsburgh Milk.  See 1982-2 C.B. 2, 4; see also Rev. Rul. 82-149, 1982-2 C.B. 56.

discounts accorded patrons from the purchase price it charges those patrons in determining gross receipts.

We shall consider further the nature of patronage dividends.

### c. Patronage Dividends Considered Price Adjusments

We have said: "Patronage dividends are considered rebates on purchases or deferred payments on sales, allocated or distributed pursuant to a preexisting obligation of the cooperative, and, as such, do not constitute taxable income to the cooperative." Buckeye Countrymark, Inc. v. Commissioner, 103 T.C. 547, 558 (1994).

The notion that a cooperative should not be taxed on patronage-based payments because those payments amount to nothing more than price adjustments is a longstanding rationale underlying the Federal income tax treatment of patronage dividends. Subchapter T was added to the Internal Revenue Code by the Revenue Act of 1962 (the 1962 Act), Pub. L. 87-834, section 17, 76 Stat. 1045. Before the 1962 Act, non-tax-exempt cooperatives were taxed as corporations. See Ravenscroft, "The Proposed Limitation on the Patronage Dividend Deduction", 12 Tax L. Rev. 151, 152 (1957). However, under administrative practices, judicially affirmed, they could exclude from gross income the amounts allocated to patrons as patronage dividends. E.g., Farmers Coop. Co. v. Birmingham, 86 F. Supp. 201, 219 (N.D. Iowa 1949) (collecting administrative rulings). Primarily,

two distinct theories were advanced as the reason for the exclusion of patronage dividends from the taxable income of cooperatives. Certified Grocers, Inc. v. United States, 18 AFTR 2d 5012, 66-2 USTC par. 9493 (M.D. Fla. 1966). In that case, the District Court described those theories as follows:

> Under the so-called agency theory, the cooperative should never be taxed because it is conceived of as an agent, bailee, or trustee for the patrons, serving merely as a conduit for their income which it does not own. On the other hand, the so-called price adjustment theory excludes patronage dividends from income because it treats the dividends as minor adjustments in the costs of goods, analogous to discounts and rebates given by a seller at the time of sale or upon prompt payment. [Id. at 5,013, 66-2 USTC par. 9493, at 86,547.]

See also discussion and cases collected in Ravenscroft, supra at 154-168; Reynolds, "What Then To Do With a Non-Cooperative Cooperative?" 56 Tax Law. 825, 831-832 (2003).

The price adjustment theory appears to have been the more widely accepted theory. Certified Grocers, Inc. v. United States, supra; Ravenscroft, supra at 157, 160; Reynolds, supra at 831. Indeed, the U.S. Court of Appeals for the Fifth Circuit has said:

> The exclusion of patronage dividends for federal income tax purposes has not been placed upon the ground that cooperatives are special creatures of statute under the tax laws, but rather upon the theory that patronage dividends are in reality rebates on purchases or deferred payments on sales allocated or distributed pursuant to a pre-existing obligation of the cooperative, and thus do not constitute taxable income to the cooperative. * * *

United States v. Miss. Chem. Co., 326 F.2d at 573 (citing Midland Coop. Wholesale Oil Association v. Commissioner, 44 B.T.A. 824 (1941), for the stated proposition).

The legislative history of the 1962 Act indicates that, in providing a statutory deduction for patronage dividends, the tax-writing committees of Congress had in mind the price adjustment theory.  S. Rept. 1881, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 707, 822 ("patronage dividends represent price adjustments"); H. Rept. 1447, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 405, 485-486 (similar).

### d.   The Price Adjustment Theory Has Its Limits

An examination of the limited caselaw on the subject and scholarly and other authoritative writings convinces us that, although the Federal income tax treatment of patronage dividends may rest substantially on the price adjustment theory, a price adjustment made by a cooperative may reduce its gross income even if the adjustment does not qualify as a patronage dividend.

It has long been understood that the distinguishing characteristic of a cooperative enterprise is the obligation of the enterprise to distribute what may be called its "excess receipts" (or "net margins") on a patronage basis.  See Packel, Law of Cooperatives 248-249 (3d ed. 1956).  While there is some question as to whether, with regard to a cooperative enterprise, the concept of profit is appropriate (since the enterprise is run

for the benefit of those who do business with it and not for the purpose of making a profit for the organizers), the idea is that, periodically, any surplus, or amount in excess of the break-even point from doing business with patrons, will be returned to the patrons on the basis of their dealings with the cooperative (i.e., on a patronage basis). See id. Indeed, today, for Federal income tax purposes, patronage dividends are determined by reference to the "net earnings" of the organization from business done with or for its patrons. Sec. 1388(a)(3); sec. 1.1388-1(a)(1), Income Tax Regs. The regulations describe "net earnings" as including "the excess of amounts retained (or assessed) by the organization to cover expenses or other items over the amount of such expenses or other items." Sec. 1.1388-1(a)(1), Income Tax Regs.

Notwithstanding the question of the appropriateness of the term "profit" with respect to a cooperative enterprise, both early administrative interpretations and judicial decisions conceived of a patronage dividend not as a simple price adjustment or immediate rebate but as a distribution of corporate profits or income. In O.D. 64, 1 C.B. 208 (1919), the Commissioner ruled concerning an incorporated fruit grower's association that conducted its business at a profit. It ruled that the nonexempt corporation would not have to pay any income tax on its patronage dividends. It authorized the corporation

to: "deduct from gross income amounts periodically returned to members as a refund of profits on business transacted with them, and proportioned to the amount of such business." Id. (emphasis added). In United Coops., Inc. v. Commissioner, 4 T.C. 93, 107-108 (1944), we held that an agricultural cooperative was entitled to exclude from gross income as a patronage dividend the excess of its net income available for distribution to its patrons (and to which they had a right) over the amount of that income that the cooperative had discretion to pay as dividends on its common stock. We said:

> These dividends, if paid, would be paid out of net income. If dividends were not paid, then the net income of petitioner available for distribution to its patrons would be accordingly greater. The choice of whether so much of its net income as equaled 8 percent of the par value of its common stock should be distributed to its stockholders as a dividend or to its patrons as rebates was in the corporation. * * * [Id. at 108; emphasis added.]

It hardly seems disputable that, whether by administrative or judicial decision, or by act of Congress, the allowance of a deduction for patronage dividends was intended not to confirm that a trade discount is a proper adjustment to the price reported on a particular sale of a good or service to a patron (whether a shareholder or not) but was intended to allow a deduction for a patronage-based return made from the excess proceeds from many sales, to many patrons (i.e., from net earnings), over the course of time.

That patronage dividends are somehow different from transaction-specific price reductions was recognized well before Congress codified the definition of a patronage dividend in 1962. The difference was recognized by courts overseeing legislative price regulation in fields in which cooperatives operated. In 1950, the U.S. Court of Appeals for the Third Circuit held that a purchasing cooperative cannot use its cooperative status as a shield against State Fair Trade Laws prohibiting price reductions at the time of sale. Sunbeam Corp. v. Civil Serv. Employees' Coop. Association, 187 F.2d 768 (3d Cir. 1951). Also in 1950, the California District Court of Appeals held that the provisions of the California Corporations Code that permit a cooperative corporation to distribute its earnings to its shareholder-patrons are paramount to the provisions of the California Alcoholic Beverage Control Act that prohibit sales of liquor at less than posted prices and secret rebates. Certified Grocers v. State Bd. of Equalization, 223 P.2d 291 (Cal. Dist. Ct. App. 1950).

A categorical difference between patronage dividends and transaction-specific price reductions had been recognized by commentators. See, e.g., Packel, supra at 217 ("It is important to distinguish a price reduction, given at the time of the transaction, from a true patronage dividend."); Bunn, Consumers' Co-Operatives and Price Fixing Laws, 40 Mich. L. Rev. 165, 173 (1941) ("The truth is that a patronage dividend is not a price

reduction on any given sale."). One commentator has explained the distinction as being based on the impracticability, if not the impossibility, of relating patronage dividends to gain or loss upon any particular transaction with any particular patron. Adcock, "Patronage Dividends: Income Distribution or Price Adjustment", 13 Law & Contemp. Probs. 505 (1948). As explained by Professor Bunn (who, in Sunbeam Corp. v. Civil Service Employees' Cooperative Assn., supra, was credited for his "scholarly discussion" that "greatly helped" the court):

> [A patronage dividend] cannot be allowed or promised when a sale is made, for it is made from earnings only, and no one can be sure there will be any earnings. Our business may sell at an eighty per cent mark-up and still go broke if overhead exceeds that spread. And we will not know our overhead per unit until we know our total volume. Neither will we know our bad debts, or other losses. We may make shrewd guesses, and quite close estimates of earnings if we know our business well, but we cannot be sure, and therefore we can never promise. * * *

Bunn, supra at 173. Professor Bunn concludes:

> True patronage dividends are divisions of net earnings. Net earnings are not made on any single sale. They result from the total operations of some accounting period, and become known only after the results for that period are in. A distribution of them, on whatever basis, is not a price reduction nor a rebate * * * .

Id. (fn. ref. omitted).

e.  Conclusion

We do not believe that Congress intended to subsume within the definition of the term "patronage dividend" transaction-specific price reductions such as are encompassed by the term "trade discount".  While the term "rebate" may sometimes be used in explaining the allowance of the deduction for patronage dividends, see, e.g., Buckeye Countrymark, Inc. v. Commissioner, 103 T.C. at 558, we agree with the commentators that there is a categorical difference between a rebate in the nature of a trade discount and a patronage dividend.  A patronage dividend is paid under an obligation to distribute some or all of net earnings of the enterprise on the basis of patronage.[11]  Respondent puts his finger right on the difference when he argues that petitioner cannot show that the passed-on rebates he deems petitioner to have made "were calculated by reference to the net earnings of the cooperative from business done with or for its patrons." They were not; they were calculated exclusively with reference to the rebates accorded to petitioner by the vendors on account of orders taken by petitioner from member stores at the food shows. If we were to agree with respondent that, for lack of a net

---

[11]  In theory, of course, a cooperative could set its prices so as to minimize its profit and reduce the amount available for patronage dividends.  That has been referred to as the "pricing out" problem, which may exist more in theory than in practice. See Patterson, The Tax Exemption of Cooperatives 89-90 (2d rev. ed. 1961).  In any event, it does not concern us here.

earnings connection, the passed-on rebates fail as price adjustments because they are defective patronage dividends, then what of other transaction-specific rebates, refunds, or price adjustments?  Are we to conclude that, if a purchasing cooperative has a buy-two-get-one-free sale, offers a loss-leader or a volume discount, or, indeed, sells any good or service for less than some hypothetical normal price, it has paid a defective patronage dividend unless, in some way, it can show that the price reduction is a distribution of net earnings?  Indeed, must any merchant offering a rebate, refund, or other price reduction consider whether it is operating on a cooperative basis, distributing defective patronage dividends?  We think not.

We conclude that a transaction-specific price reduction, such as is encompassed by the term "trade discount", is not generally determined with respect to the net earnings of the payer, and, for that reason, it is not a patronage dividend (defective or not).

### 4.  Other Factors

Respondent argues that petitioner "has virtually no records of the currency incentives used at the food shows.  It destroyed most of the relevant records.  * * *  This fact combined with the use of cash invites suspicion."  While it is true that petitioner discarded most all of the tear strips after the relevant information was entered into its billing and accounting records,

petitioner had sufficient information to compute its margin on each sale.  There also is a stipulation as to the net amount of petitioner-delivered currency retained by the vendors.  There is no evidence confirming the actual payments of petitioner-delivered currency by vendors to member stores, but the deemed fact of those payments underlies respondent's adjustments.  While cash payments to member stores might invite abuse by the member stores, there is no evidence of any such abuse here, and, to the extent that payments were actually made by the vendors to member stores, we assume that the vendors had adequate motivation to keep adequate records of those payments.  In short, whatever shortcomings exist in petitioner's records, respondent has failed to convince us that those shortcomings justify denying petitioner a reduction in the amount of its gross receipts from sales to member stores on account of deemed rebates that respondent would charge against petitioner's costs of goods sold and would treat as having been passed on as price reductions to the member stores.

### 5.  Conclusion

The deemed rebates that respondent charges petitioner with making are (if they are to be charged to petitioner) properly characterized as trade discounts.  They were not paid with reference to petitioner's net earnings but merely passed along price adjustments that petitioner was entitled to on account of

the orders placed by the member stores at the food shows.  They reduce petitioner's gross receipts and are not defective patronage dividends.[12]

C.  Conclusion

For the audit years, petitioner had no items of gross income on account of petitioner-delivered currency paid by vendors to member stores as show money.

IV.  Conclusion

In the light of the foregoing,

Decision will be entered

for petitioner.

---

[12]  Our conclusion is, of course, based on the assumption that the petitioner-delivered currency paid to member stores flowed through petitioner, as passed-on rebates, in the manner described supra in sec. III.B.1 of this report.  We do not decide that manufacturers' rebates paid directly to retail customers are necessarily deemed to pass through the retailer.  Such a rebate was addressed by the Commissioner in Rev. Rul. 76-96, 1976-1 C.B. 23, suspended in part by Rev. Rul. 2005-28, 2005-1 C.B. 997, which describes an automobile manufacturer's rebate paid directly to qualifying retail customers and gives no indication that the rebate was considered to have flowed through the retailer.